137 N.J. Super. 227 (1975)
348 A.2d 801
IN THE MATTER OF KAREN QUINLAN, AN ALLEGED INCOMPETENT.
Superior Court of New Jersey, Chancery Division.
Decided November 10, 1975.
*235 Mr. Paul W. Armstrong argued the cause for petitioners Joseph and Julia Quinlan; (Mr. James M. Crowley of the New York Bar, of counsel; Mr. Armstrong and Mr. Crowley on the briefs).
Mr. Daniel Coburn, guardian ad litem, argued the cause for Karen Quinlan, an alleged incompetent (Mr. Coburn, Ms. Astrid Baumgardner, Ms. Leslie Obus, Mr. Drew Kastner, Mr. Bruce Shaine, legal assistants, on the brief).
Mr. William F. Hyland, Attorney General of New Jersey, and Mr. David S. Baime, Chief, Appellate Section, argued the cause for the defendant State of New Jersey (Mr. John De Cicco, First Assistant, Appellate Section, of counsel and on the brief; Mr. David S. Baime, Ms. Jane E. Deaterly, Mr. Daniel Louis Grossman, Mr. Robert E. Rochford, Ms. Helen E. Szabo and Mr. William Welaj, Deputy Attorneys General, on the briefs).
Mr. Donald G. Collester, Prosecutor of Morris County, argued the cause for defendant County of Morris (Mr. Collester and Mr. Bruce Chait on the brief).
Mr. Ralph Porzio argued the cause for defendants Doctor Arshad Javed and Doctor Robert J. Morse. (Messrs. Porzio, Bromberg and Newman, attorneys; Mr. Porzio on the brief).
*236 Mr. Theodore E.B. Einhorn argued the cause for the defendant St. Clare's Hospital (Mr. Einhorn on the brief).
MUIR, J.S.C.
In his initial pleading Joseph Quinlan, father of 21-year-old Karen Ann Quinlan, seeks, on grounds of mental incompetency, to be appointed the guardian of the person and property of his daughter. He alleges her "vital processes are artificially sustained via the extraordinary means of a mechanical MA-1 Respirator." He imprecates the court grant "the express power of authorizing the discontinuance of all extraordinary means of sustaining the vital processes of his daughter."
By a pleading amendment he also seeks to restrain the Morris County Prosecutor, Karen Quinlan's attending and treating physicians and St. Clare's Hospital from interfering with the exercise of the authorization sought, and to enjoin the prosecutor from prosecuting for homicide when the authorization sought is effected.
The court, pursuant to R. 4:26-2, appointed Daniel Coburn, Esq., guardian ad litem.
At the pretrial conference held on the return date of an order to show cause issued with the amended pleading, the State of New Jersey through the Attorney General intervened.
Plaintiff initially asserted that Karen Quinlan is legally and medically dead but altered this position prior to trial by admitting she is not dead "according to any legal standard recognized by the State of New Jersey."
It is stipulated by all parties that Karen Ann Quinlan is unfit and unable to manage her own affairs.
The court's findings of fact are as hereinafter set forth:
Karen Ann Quinlan, one of three children of Joseph and Julia Quinlan, was born April 24, 1954. She was baptized and raised a Roman Catholic. She attended Roman Catholic Church-affiliated elementary and secondary schools. She is a member of her parents' local Roman Catholic Church in *237 Mount Arlington, New Jersey. The parish priest is Father Thomas A. Trapasso.
Sometime in late 1974 or early 1975 Karen Quinlan moved from her parents' home. Thereafter she had at least two subsequent residences, with the last being a lake cottage in Sussex County, New Jersey.
On the night of April 15, 1975 friends of Karen summoned the local police and emergency rescue squad, and she was taken to Newton Memorial Hospital. The precise events leading up to her admission to Newton Memorial Hospital are unclear. She apparently ceased breathing for at least two 15-minute periods. Mouth-to-mouth resuscitation was applied by her friends the first time and by a police respirator the second time. The exact amount of time she was without spontaneous respiration is unknown.
Upon her admission to Newton Memorial urine and blood tests were administered which indicated the presence of quinine, aspirin, barbiturates in normal range and traces of valium and librium. The drugs found present were indicated by Dr. Robert Morse, the neurologist in charge of her care at St. Clare's, to be in the therapeutic range, and the quinine consistent with mixing in drinks like soda water.
The cause of the unconsciousness and periodic cessations of respiration is undetermined. The interruption in respiration apparently caused anoxia  insufficient supply of oxygen in the blood  resulting in her present condition.
Hospital records at the time of admission reflected Karen's vital signs to be normal, a temperature of 100, pupils unreactive, unresponsivity to deep pain, legs rigid and curled up, with decorticate brain activity. Her blood oxygen level was low at the time. She was placed upon a respirator at Newton Hospital.
At 10 P.M. on April 16, 1975 Dr. Morse examined Karen at the request of her then attending physician. He found her in a state of coma, with evidence of decortication indicating altered level of consciousness. She required the respirator *238 for assistance. She did not trigger the respirator, which means that she did not breathe spontaneously nor independently of it at any time during the examination. Due to her decorticate posturing, no reflexes could be elicited.
In the decorticate posturing the upper arms are drawn into the side of the body. The forearms are drawn in against the chest with the hands generally at right angles to the forearms, pointing towards the waist. The legs are drawn up against the body, knees are up, feet are in near the buttocks and extended in a ballet-type pose.
He found her oculocephalic and oculovestibular reflexes normal. The oculocephalic reflex test consists of turning the head from side to side with the eyes open. In a positive response, when the head is rotated to the right, the eyes deviate to the left. As part of this test the head is also moved front and back, the neck is flexed in the back movement, causing the eyelids to open. This phenomenon is called "doll's  eyelid response". (Dr. Morse found that reflex intact on April 26, according to hospital records.) The oculovestibular reflex ascertained by a caloric stimulation test consists of the slow introduction of ice water into the ear canal. The eyes drift or move toward the irrigated ear. It is a lateral eye movement test.
He also found pupillary reaction to light in both eyes.
Her weight at the time was 115 pounds.
Dr. Morse could not obtain any initial history (i.e., the circumstances and events occurring prior to Karen's becoming unconscious). There was no information available from her friends. He speculated at the outset on the possibility of an overdose of drugs, past history of lead poisoning, foul play, or head injury due to a fall. He indicated that the lack of an initial history seriously inhibits a diagnosis.
Karen was transferred to the Intensive Care Unit (I.C.U.) of St. Clare's Hospital, under the care of Dr. Morse. At the time of her transfer she was still unconscious, still on a respirator; a catheter was inserted into her bladder and a tracheostomy had been performed.
*239 Upon entry to the St. Clare's I.C.U. she was placed on a MA-1 respirator, which provides air to her lungs on a controlled volume basis. It also has a "sigh volume," which is a periodic increase in the volume of air to purge the lungs of any accumulation of fluids or excretions. The machine takes over completely the breathing function when the patient does not breathe spontaneously.[1]
Subsequently, the serial blood gas or arterial blood gas examinations were made. The tests indicate the degree of acidity (pH) in the blood, the level of oxygen (p02) in the blood and the level of carbon dioxide (pC02) in the blood. The latter is indicia of the extent carbon dioxide is discharged from the lungs. The pH reflects whether there is an excess of acid (acidosis) or an insufficiency of acid (alkalosis) in the blood. I note, parenthetically, that the blood gas tests have been conducted continuously from the time of Karen's admission to St. Clare's up to the present. There are constant references through the hospital records of pH, p02 and pC02 measurements. Dr. Javed, the attending physician internist, indicated some 300 tests were conducted.
Dr. Javed testified the blood tests were all normal while Karen was on the respirator.
In an effort to ascertain the cause of the coma, Dr. Morse conducted a brain scan, an angiogram, an electroencephalogram (EEG), a lumbar tap and several other tests. The first three are related to the brain and are conducted, according to the testimony, with the object of finding an injury or insult to the brain, such as a subdural hematoma or the like, or for ascertaining any abnormality in the brain activity patterns. The latter is particularly true of the EEG where electrodes are placed on the skull. The measurement *240 is made of cortical neurons. The neuron is basically a conducting cell of nervous energy. The recordings are made on awake and sleep cycles. The awake recorded data, referred to in the testimony as alpha rhythm or activity, indicates a frequency of pattern which can be compared against normal frequencies or patterns to determine whether any abnormality exists. The EEG establishes the existence or non existence of normal patterns. It does not precisely locate the insult or lesion causing, in this case, the unconsciousness. Dr. Morse indicated that the EEG performed at the outset established nothing abnormal for a comatose person and did not establish the offending agent to her central nervous system which caused her unconsciousness. Subsequent EEGs provided no further information. All indicated brain rhythm or activity.[2]
Subsequent tests and examinations did not further the establishment of the precise location and cause of Karen's comatose condition.
Dr. Morse testified concerning the treatment of Karen at St. Clare's. He averred she receives oral feedings since intravenous feeding is insufficient to sustain her. She is fed a high caloric nutrient called "Vivenex," which she receives through a small nasal gastro tube inserted in her gastro-intestinal system. He asserts this is necessary to keep her "viable". She has apparently lost considerable weight, being described as emaciated by most of the examining experts, who also indicate her weight condition to be good under the circumstances.
There is constant threat of infection, according to Dr. Morse. Antibiotics are administered to thwart potential infection, with tests constantly being made to keep a check *241 on this threat. The hospital records indicate specialists consulted with respect to the cleaning, utilization and operation of the urethral catheter and with respect to the treatment and care of decubiti (lesions commonly known as bed sores) generated by her continuous repose.
The day-by-day charts, entitled "Vital Signs," kept by nurses who give her 24-hour care, indicate, in part, the following:
1. Her color was generally pale, her skin warm, she was almost constantly suffering from diaphoresis (sweating), many times profusely but occasionally moderately or not at all;
2. There was always a reaction to painful stimuli, she responded decerebrately to pain, she sometimes would grimace as if in pain, which would be followed by increased rigidity of her arms and legs;
3. There would be periodic contractions and spasms, periodic yawning, periodic movements of spastic nature;
4. Pupils were sometimes dilated, sometimes normal, but almost always sluggish to light;
5. Body waste disposal through the urethral catheter and the bowel was indicated to occur;
6. Feedings of Vivinex were given alternately with water on various nurses shifts;
7. The nurses were constantly moving, positioning, and bathing her;
8. Body rashes occurred at times; decubiti were treated with heat lamps on occasions;
9. Sometimes she would trigger and assist the respirator; other times she would go for periods without triggering it at all;
10. Her extremities remained rigid with contraction of them being described as severe at times;
11. On May 7, nurses indicated she blinked her eyes two times when asked to and appeared responsive by moving her eyes when talked to, but there is no further evidence of this type reaction thereafter.
Dr. Javed indicated that efforts were made to wean or remove Karen from the respirator. The hospital records support this. Dr. Javed testified that for weaning to be successful, the patient must have a stable respiratory pattern. Karen was taken off the respirator for short periods of time. Each time, her respiratory rate, rate of breathing, went up and *242 the volume of air intake would decrease. He indicated her breathing rate would more than double in intensity while her "tidal volume" or air intake would drop 50%. The longest period of time she was off the respirator was one-half hour. He further indicated that during removal from the respirator her p02 dropped. He stated that the respiratory problem is secondary to the neurological problem, and without improvement in the latter she cannot be removed from the respirator since she would be unable to maintain her vital processes without its assistance.
Dr. Morse's hospital notes indicate there is no neurological improvement from the time of her admission to St. Clare's to date. He testified that Karen changed from a sleeping comatose condition to a sleep-awake type comatose condition but described this as normal in comatose patients and not any indication of improvement. During the awake cycle she is still unconscious.
In Dr. Morse's opinion the cause of Karen's condition is a lesion on the cerebral hemispheres and a lesion in the brain stem. In response to various questions from respective counsel he described the cortex of the brain as being affected, with involvement of the brain stem. He indicated that the leison involves the central hemisphere as far down as the thalamus, with patchy areas of the diencephalon and the respiratory centers located in the pons and medulla areas, and also noted there is evidence of possible cerebral hemorrhage, subcortical white matter involvement, and possible involvement of the diencephalon and certain portions of the brain stem. In Dorland's Illustrated Medical Dictionary (25 ed. 1965), 365, the cortex is defined as the outer layer or thin layer of gray matter on the surface of the cerebral hemisphere, and that it reaches its highest development in man, where it is responsible for the higher mental functions, for general movement, for visceral functions, perception, and behavioral reaction, and for the association and integration of these functions. The testimony *243 indicated that white matter is located under the cortex. It also reflected a system of nerves commencing with the spine, leading through the brain stem and spreading out in network fashion through the cerebral hemispheres, encompassing the white matter and cortex.
The brain stem is described as consisting of essentially three parts: the pons, the medulla oblongata, and the mid-brain, with some authorities including the diencephalon. It is the stemlike portion of the brain that connects the cerebral hemispheres with the spinal cord. The brain stem, apparently, including the diencephalon, is the control for the respiratory functioning of the body.
In the absence of a clear history, Dr. Morse relied basically upon the decorticate posturing of Karen Quinlan and the respiratory difficulty for reaching his conclusion as to the brain lesion locations. He contrasted the decorticate posture to decerebrate posture of a patient for drawing his conclusions.
He asserted with medical certainty that Karen Quinlan is not brain-dead. He identified the Ad Hoc Committee of Harvard Medical School Criteria as the ordinary medical standard for determining brain death, and that Karen satisfied none of the criteria. These criteria are set forth in a 1968 report entitled, "Report of the Ad Hoc Committee of Harvard Medical School to Examine the Definition of Brain Death: A Definition of Irreversible Coma," 205 J.A.M.A. 85 (1968).
The report reflects that it is concerned "only with those comatose individuals who have discernible central nervous system activity" and the problem of determining the characteristics of a permanently nonfunctioning brain. The criteria as established are:
1. Unreceptivity and Unresponsitivity  There is a total unawareness to externally applied stimuli and inner need and complete unresponsiveness * * *. Even the most intensely painful stimuli evoke no vocal or other response, not even a groan, withdrawal of a limb, or quickening of respiration.
*244 2. No Movements or Breathing  Observations covering a period of at least one hour by physicians is adequate to satisfy the criteria of no spontaneous muscular movement or spontaneous respiration or response to stimuli such as a pain, touch, sound or light. After the patient is on a mechanical respirator, the total absence of spontaneous breathing may be established by turning off the respirator for three minutes and observing whether there is any effort on the part of the subject to breathe spontaneously * * *
3. No Reflexes  Irreversible coma with abolition of central nervous system activity is evidenced in part by the absence of elicitable reflexes. The pupil will be fixed and dilated and will not respond to a direct source of bright light. Since the establishment of a fixed, dilated pupil is clear-cut in clinical practice, there would be no uncertainty as to its presence. Ocular movement (to head turning and to irrigation of ears with ice water) and blinking are absent. There is no evidence of postural activity (deliberate or other). Swallowing, yawning, vocalization are in abeyance. Corneal and pharyngeal reflexes are absent.
As a rule the stretch of tendon reflexes cannot be elicited; i.e., tapping the tendons of the biceps, triceps, and pronator muscles, quadriceps and gastrocnemius muscles with reflex hammer elicits no contraction of the respective muscles. Plantar or noxious stimulation gives no response.
4. Flat  Electroencephalogram  of great confirmatory value is the flat or isoelectric EEG * * *.
All tests must be repeated at least 24 hours later with no change.
The validity of such data as indications of irreversible cerebral damage depends on the exclusion of two conditions: hypothermia (temperature below 90° F.) or central nervous system depressants, such as barbiturates.
Dr. Morse reflected carefully in his testimony on Karen's prognosis. He described her condition as a chronic or "persistent vegetative state." Dr. Fred Plum, a creator of the phrase, describes its significance by indicating the brain as working in two ways:
We have an internal vegetative regulation which controls body temperature, which controls breathing, which controls to a considerable degree blood pressure, which controls to some degree heart rate, which controls chewing, swallowing and which controls sleeping and waking. We have a more highly developed brain, which is uniquely human, which controls our relation to the outside world, our capacity to talk, to see, to feel, to sing, to think. [See Dorland's definition set forth heretofore.] Brain death necessarily must mean the death of both of these functions of the brain, vegetative and the sapient. Therefore, the presence of any function which is regulated *245 or governed or controlled by the deeper parts of the brain which in layman's terms might be considered purely vegetative would mean that the brain is not biologically dead.
Dr. Morse, in reflecting on the prognosis, notes Karen's absence of awareness of anything or anyone around her. In response to a direct question he noted she is not suffering from locked-in syndrome in which a patient is conscious but so totally paralyzed that communications can be made only through a complex system of eye or eyelid movements.
Dr. Morse states Karen Quinlan will not return to a level of cognitive function (i.e., that she will be able to say "Mr. Coburn I'm glad you are my guardian.") What level or plateau she will reach is unknown. He does not know of any course of treatment that can be given and cannot see how her condtion can be reversed, but is unwilling to say she is in an irreversible state or condition. He indicated there is a possibility of recovery but that level is unknown, particularly due to the absence of pre-hospital history.
Karen Ann Quinlan was examined by several experts for the various parties. All were neurologists with extensive experience and backgrounds. Some had done research in the area of brain injury, conscious and comatose behavior. The qualifications of all were admitted.
On October 2, 1975 Dr. Stuart Cook, Dr. Eugene Loesser and Dr. Fred Plum, in the presence of Doctors Morse, Javed and others, examined Karen. Each reviewed the medical and hospital records and talked with the attending physicians. The examination consisted in part of Karen's removal from the respirator for a 3-minute and 45-second interval and an EEG.
Their testimonies did not vary significantly. Some gave in greater detail than others. A general synopsis of their testimonies indicates they found Karen comatose, emaciated and in a posture of extreme flexion and rigidity of the arms, legs and related muscles which could not be overcome, *246 with her joints severely rigid and deformed. During the examination she went through awake and sleep periods but mostly awake. The eyes moved spontaneously. She made stereotyped cries and sounds and her mouth opened wide when she did so. Cries were evoked when there was noxious stimulation. She reflexed to noxious stimuli. Her pupils reacted to light and her retinas were normal. Her reflex activity, deep tendon reflexes and plantar stimulation of soles of her feet could not be elicited because of the severe flexion contractures. She triggered the respirator during the entire examination except for the interval of removal. When she was removed from the respirator, with an oxygen catheter inserted through the tracheostomy, she breathed spontaneously and her blood gases were in a normal range. Her EEG showed normal electrical activity for a sedated person. (She was sedated for the EEG). She does not have the locked-in syndrome.
All agree she is in a persistent vegetative state. She is described as having irreversible brain damage; no cognitive or cerebral functioning; changes for useful sapient life or return of discriminative functioning are remote. The absence of knowledge on the events precipitating the condition, and the fact that other patients have been comatose for longer periods of time and recovered to function as a human, made Dr. Cook qualify his statement as to the return to discriminative functioning. All agree she is not brain-dead by present-known medical criteria and that her continued existence away from the respirator is a determination for a pulmonary internist.
Dr. Sidney Diamond examined Karen and testified on behalf of the State. There was no EEG or removal from the respirator during his examination. He reviewed her history and talked with the treating physicians. His physical observations of her conformed with those of the other examining neurologists. He states Karen is not brain-dead within the Harvard Criteria.
*247 He considered "empirical data" which included Dr. Javed's weaning attempts and said he was convinced there is no evidence she can continue to exist physically without the respirator. His opinion is that no physician would interrupt the use of the respirator and that the continued use of the respirator does not deviate from standard medical practice.
Dr. Julius Korein testified as an expert on behalf of plaintiff. There was no removal from the respirator when he examined Karen. He also reviewed medical and hospital records and talked to treating physicians. He made caloric stimulation and EEG tests.
His description of Karen's posturing, reflexes, eyes, body movements and other conditions did not vary significantly from other experts. His diagnosis of the extent and area of the brain injury or lesion  in the cerebral hemisphere with brain stem involvement  essentially agrees with that of Dr. Morse. He described the upper brain area injury as a severe bilateral cerebral involvement with anoxia as the probable cause. He found a palmomental reflex, evidencing interruption in the brain stem fibre. He indicates the extensiveness of the reflex, a dimpling of the chin generated by stimulation of the palm, is greater than usually found because any stimulation along the entire arm generated it.
He described her condition as a persistent vegetative state.
In response to questions concerning her dependency on the respirator, he acknowledged that the information of Dr. Javed showing respiratory difficulty and low oxygen in the blood while off the respirator establishes her need to continue on it if her life is to continue.
He described the responses to caloric stimulation as abnormal.
He is the only expert who testified on the concepts of "ordinary" and "extraordinary" medical treatment. Essentially, he considers use of a respirator at the admission of a patient an "ordinary" medical practice. He equates the *248 usage of it with an "extraordinary" practice when it is used for a prolonged period of time in concert with other hospital resources, including extensive nursing care. He acknowledges the term "extraordinary" lacks precision in definition.
Testimony of other doctors reflects an inclination that the use of the respirator is an ordinary medical practice.
The decision to request removal of their daughter from the respirator, understandably came tortuously, arduously to the Quinlans. At the outset they authorized Dr. Morse to do everything he could to keep her alive, believing she would recover. They participated in a constant vigil over her with other family members. They were in constant contact with the doctors, particularly Dr. Morse, receiving day-by-day reports concerning her prognosis which, as time passed, became more and more pessimistic and more and more discouraging to them.
Mrs. Quinlan and the children were the first to conclude Karen should be removed from the respirator. Mrs. Quinlan, working at the local parish church, had ongoing talks with Father Trapasso, who supported her conclusion and indicated that it was a permissible practice within the tenets of Roman Catholic teachings.
Mr. Quinlan was slower in making his decision. His hope for recovery continued despite the disheartening medical reports. Neither his wife nor Father Trapasso made any attempt to influence him. A conflict existed between letting her natural body function control her life and the hope for recovery. Precisely when he came to a decision is not clear. By his testimony he indicated early September, but he signed a release to the hospital dated July 31, 1975, hereafter referred to, which makes it reasonably inferrable that the decision was made in July. Once having made the decision, he sought Father Trapasso's encouragement, which he received.
Father Trapasso based his support of the position taken by the Quinlans on the traditional, moral precepts of the *249 Roman Catholic faith and upon a declaration, designated an allocutio, by Pope Pius XII made on November 24, 1957. Speaking to a group of anesthesiologists the Pope was requested to respond to the question:
When the blood circulation and the life of a patient who is deeply unconscious because of a central paralysis are maintained only through artificial respiration, and no improvement is noted after a few days, at what time does the Catholic Church consider the patient "dead", or when must he be declared dead according to natural law?
The Papal response was:
"Where the verification of the fact in particular cases is concerned, the answer cannot be deduced from any religious and moral principle and, under this aspect, does not fall within the competence of the Church. Until an answer can be given, the question must remain open. But considerations of a general nature allow us to believe that human life continues for as long as its vital functions  distinguished from the simple life of organs  manifest themselves spontaneously or even with the help of artificial processes. A great number of these cases are the object of insoluble doubt, and must be dealt with according to the presumptions of law and of fact of which we have spoken.
Father Trapasso acknowledges it is not a sinful act under the church teachings or the Papal allocutio to either continue extraordinary treatment or discontinue it. It is acknowledged to be a matter left optional to a Roman Catholic believer. Mr. Quinlan indicates that had Roman Catholic traditions and morals considered it a sin, he would not be seeking termination of the respiratorial support. Mr. Quinlan avers Karen's natural bodily functions should be allowed to operate free of the respirator. He states that then, if it is God's will to take her, she can go on to life after death, and that is a belief of Roman Catholics. He asserts he does not believe or support the concept of euthanasia.
Once having made the determination, the Quinlan's approached hospital officials to effectuate their decision. Father Paschal Caccavalle, chaplain of St. Clare's, at a meeting *250 between hospital representatives and the Quinlan's, read the Papal allocutio of November 1957.
The Quinlans on July 31, 1975 signed the following:
We authorize and direct Doctor Morse to discontinue all extraordinary measures, including the use of a respirator for our daughter Karen Quinlan.
We acknowledge that the above named physician has thoroughly discussed the above with us and that the consequences have been fully explained to us. Therefore, we hereby RELEASE from any and all liability the above named physician, associates and assistants of his choice, Saint Clare's Hospital and its agents and employees.
The Quinlans, upon signing the release, considered the matter decided. Dr. Morse, however, felt he could not and would not agree to the cessation of the respirator assistance. He testified  characterizing the issue of extraordinary treatment and the termination of it as something brought up suddenly in July  that he advised the Quinlans prior to the time of the release that he wanted to check into the matter further before giving his approval. After checking on other medical case histories, he concluded that to terminate the respirator would be a substantial deviation from medical tradition, that it involved ascertaining "quality of life," and that he would not do so.
Karen Quinlan is quoted as saying she never wanted to be kept alive by extraordinary means. The statements attributed to her by her mother, sister and a friend are indicated to have been made essentially in relation to instances where close friends or relatives were terminally ill. In one instance an aunt, in great pain, was terminally ill from cancer. In another instance the father of a girl friend was dying under like circumstances. In a third circumstance a close family friend was dying of a brain tumor. Mrs. Quinlan testified that her daughter was very full of life, that she loved life and did not want to be kept alive in any way she would not enjoy life to the fullest.
No testimony was elicited concerning the nature and extent of the assets of Karen Quinlan. By affidavit in support *251 of the application Joseph Quinlan indicates she receives $157.70 a month from a federal Supplemental Security Income program and has a personal estate valued at approximately $300, consisting primarily of personal possessions. This information is deemed adequate to satisfy proof requirements under R. 4:83.
Plaintiff urges that the court may resolve the matter in his favor through declaratory judgment and its inherent equitable powers. He urges there is a sufficient controversy to justify declaratory relief. He asserts that an injunction should issue to prevent the risk of arrest and prosecution that might result from the court's authorization. He contends that under the equitable doctrine of substituted judgment this court can act in Karen Quinlan's best interest by authorizing the cessation of the respirator. He asserts that Karen Quinlan and her family have by virtue of the constitutional right of privacy a right of self-determination which extends to the decision to terminate "futile use of extraordinary medical measures." Also asserted as grounds for granting the sought relief are the constitutional right of free exercise of religious belief and freedom from cruel and unusual punishment.
All defendants rely on John F. Kennedy Memorial Hospital v. Heston, 58 N.J. 576 (1971), to challenge the constitutional claims, asserting that no constitutional right to die exists and arguing a compelling state interest in favor of preserving human life.
They all, essentially, contend that since Karen Quinlan is medically and legally alive, the court should not authorize termination of the respirator  that to do so would be homicide and an act of euthanasia.
The doctors suggest that the decision is one more appropriately made by doctors than by a court of law, and that under the circumstances of this case a decision in favor of plaintiff would require ascertainment of quality-of-life standards to serve as future guidelines.
*252 The prosecutor, if plaintiff is granted the relief sought, requests a declaratory judgment "with regard to the effect of the homicide statutes and his duty of enforcement."
The hospital also seeks a declaratory judgment that the criteria outlined by the Ad Hoc Committee of the Harvard Medical School to Examine the Definition of Brain Death be sanctioned as the ordinary medical standards for determination of brain death.
No party contests the jurisdiction of the court to consider the application.
The case presented is:
Given the facts that Karen Quinlan is now an incompetent in a persistent vegetative state; that at the outset of her unconsciousness her parents placed her under the care and treatment of Dr. Morse, and through him, Dr. Javed and St. Clare's Hospital, urging that everything be done to keep her alive, and that the doctors and hospital introduced life-sustaining techniques, does this court have the power and right, under the mantle of either its equity jurisdiction or the constitutional rights of free exercise of religion, right of privacy or privilege against cruel and unusual punishment, to authorize the withdrawing of the life-sustaining techniques?

I
I pause to note the scope of my role. I am concerned only with the facts of this case and the issues presented by them. It is not my function to render an advisory opinion.[3] In this age of advanced medical science, the prolongation of life and of organ transplants, it is not my intent, nor can it be, to resolve the extensive civil and criminal legal dilemmas engendered.[4]
*253 The absence of specific legal precedents does not delimit the scope of my determination. The principles of prior decisions are to be considered, although, as Cardozo points out, little faith should be placed on dicta. Cardozo, The Nature of the Judicial Process, 29 (1921).[5]

II
The matter is presented to the Court, aside from constitutional considerations, in the principal framework of inherent equitable concepts and, corollary thereto, declaratory relief.[6]
*254 Plaintiff invokes the inherent power of an equity court as the protector and general guardian of all persons under a disability. He urges that under the doctrine of parens patriae the court, as representative of the sovereign, may intervene "in the best interests" of Karen Quinlan and allow her to die a natural death. The doctrine has been utilized in this State in the management and administration of an incompetent's estate, In re Trott, 118 N.J. Super. 436, 440 (Ch. Div. 1972), but not in his personal affairs. The doctrine has been extended in other jurisdictions to the personal affairs of incompetents and others suffering under disability. Strunk v. Strunk, 445 S.W.2d 145, 147-148 (Ky. Ct. App. 1969), Hart v. Brown, 29 Conn. Super. 368, 289 A. 2d 386 (Super. Ct. 1972).
As part of the inherent power of equity, a Court of Equity has full and complete jurisdiction over the persons of those who labor under any legal disability. * * * The Court's action in such a case is not limited by any narrow bounds, but it is empowered to stretch forth its arm in whatever direction its aid and protection may be needed. While this is indeed a special exercise of equity jurisdiction, it is beyond question that by virtue thereof the Court may pass upon purely personal rights. [27 Am. Jur.2d Equity, § 69 (1966)]
The power to act for an incompetent in the affairs of his estate and person has been denominated "the doctrine of substituted judgment." Strunk v. Strunk, supra, 445 S.W.2d at 148; Hart v. Brown, supra, 289 A.2d at 387.
The Strunk case involved a request to the court by the committee for a 27-year-old incompetent male to permit the transplant-of the incompetent's kidney to his fatally ill brother. The court authorized the transplant, finding the risks to the incompetent limited and determining the continued existence of the brother essential to the well-being of the incompetent.
In the Hart case the court considered the transplant of a kidney from one identical seven-year-old twin to the other. *255 Noting the absence of risk to the donor, the strong, close relationship between the infants and the need of the donee twin for the kidney if her life was to continue, the court granted the parents the authority to consent to the operations involved.
Both Hart and Strunk are persuasive in favor of the existence of the authority of this court to aid and protect Karen Quinlan and act in her best interests.
The nature and extent to which that authority is to be exercised requires analysis.
It has been stated that the power of equity is "the power possessed by judges  and even the duty resting upon them  to decide every case according to the high standard of morality and abstract right; that is the power and duty of a judge to do justice * * *" 1 Pomeroy, Jurisprudence, § 44 at 57 (1941).
It involves the obedience to dictates of morality and conscience. Id., § 45 at 59. It may not disregard statutory law and it looks to the intent rather than the form.
These dictates set the framework for the authority this court may exercise on Karen's behalf.
Equity speaks of conscience. That conscience is not the personal conscience of the judge. For if it were, the compassion, empathy, sympathy I feel for Mr. and Mrs. Quinlan and their other two children would play a very significant part in the decision. It is a judicial conscience  "a metaphorical term, designating the common standard of civil right and expediency combined, based upon general principles, and limited by established doctrines to which the court appeals, and by which it tests the conduct and right of the suitors." 1 Pomeroy Equity Jurisprudence, § 57 at 74. The rationale behind not allowing the personal conscience and therefore the noted emotional aspects are that while it may result in a decision based on a notion of what is right for these individuals, the precedential effect on future *256 litigation, particularly in light of the raging issue of euthanasia, would be legally detrimental.[7]
Equity also speaks of morality. The morality involved is that of society  The standards evolve through social advancement in a stabilized community life.
Karen Quinlan is by legal and medical definition alive. She is not dead by the Ad Hoc Committee of Harvard Medical School standards nor by the traditional definition, the stoppage of blood circulation and related vital functions.[8] The quality of her living is described as a persistent *257 vegetative state, a description that engenders total sorrow and despair in an emotional sense. She does not exhibit cognitive behavior (i.e., the process of knowing or perceiving). Those qualities unique to man, the higher mental functions, are absent. Her condition is categorized as irreversible and the chance of returning to discriminate functioning remote. Nevertheless, while her condition is neurologically activated, yet due to the absence of pre-hospital history and in light of medical histories showing other comatose patients suriving longer coma periods, there is some medical qualification on the issue of her returning to discriminative functioning and on whether she should be removed from the respirator. There is a serious question whether she can live off the respirator and survive (at least two physicians indicated she could not). It is also apparent that extensive efforts to wean her from the respirator created a danger of more extensive brain injury. There is no treatment suggested.
The judicial conscience and morality involved in considering whether the court should authorize Karen Quinlan's removal from the respirator are inextricably involved with the nature of medical science and the role of the physician in our society and his duty to his patient.
When a doctor takes a case there is imposed upon him the duty "to exercise in the treatment of his patient the degree of care, knowledge and skill ordinarily possessed and exercised in similar situations by the average member of the profession practicing in his field." Schueler v. Strelinger, 43 N.J. 330, 344 (1964). If he is a specialist he "must employ not merely the skill of a general practitioner, but also that special degree of skill normally possessed by the average physician who devotes special study *258 and attention to the particular organ or disease or injury involved, having regard to the present state of scientific knowledge". Clark v. Wichman, 72 N.J. Super. 486, 493 (App. Div. 1962). This is the duty that establishes his legal obligations to his patients.
There is a higher standard, a higher duty, that encompasses the uniqueness of human life, the integrity of the medical profession and the attitude of society toward the physician, and therefore the morals of society. A patient is placed, or places himself, in the care of a physician with the expectation that he (the physician) will do everything in his power, everything that is known to modern medicine, to protect the patient's life. He will do all within his human power to favor life against death.[9]
The attitudes of society have over the years developed a significant respect for the medical profession. Society has come to request and expect this higher duty.
But the doctor is dealing in a science which lacks exactitude, Schueler v. Strelinger, supra, 43 N.J. at 344, a science that has seen significant changes in recent years, a science that will undoubtedly have prodigious advancements in the future, but a science which still does not know the cause of some afflictions and which does not know all the interrelationships of the body functions. In recent years open heart surgery and organ transplantation have made continuation of life possible where the patient is suffering from a fatal disability. The cause of cancer remains to a major extent unknown, but advances have been made in cures and remissions. The brain, the only organ incapable of transplant to date, as Dr. Morse points out, is still, even among neuroanatomists, unknown insofar as the interrelationships of some of its parts and how these parts are controlled.
*259 Doctors, therefore, to treat a patient, must deal with medical tradition and past case histories. They must be guided by what they do know. The extent of their training, their experience, consultations with other physicians, must guide their decision-making processes in providing care to their patient. The nature, extent and duration of care by societal standards is the responsibility of a physician. The morality and conscience of our society places this responsibility in the hands of the physician. What justification is there to remove it from the control of the medical profession and place it in the hands of the courts? Aside from the constitutional arguments, plaintiff suggests, because medical science holds no hope for her recovery, because if Karen was conscious she would elect to turn off the respirator, and finally because there is no duty to keep her alive.
None of the doctors testified there was no hope. The hope for recovery is remote but no doctor talks in the absolute. Certainly he cannot and still be credible, in light of the advancements medical science has known and the inexactitudes of medical science.
There is a duty to continue the life-assisting apparatus, if, within the treating physician's opinion, it should be done. Here Dr. Morse has refused to concur in the removal of Karen from the respirator. It is his considered position that medical tradition does not justify that act. There is no mention, in the doctor's refusal, of concern over criminal liability, and the court concludes that such is not the basis for his determination. It is significant that Dr. Morse, a man who demonstrated strong empathy and compassion, a man who has directed care that impressed all the experts, is unwilling to direct Karen's removal from the respirator.
The assertion that Karen would elect, if competent, to terminate the respirator requires careful examination.
She made these statements at the age of 20. In the words of her mother, she was full of life. She made them under *260 circumstances where another person was suffering, suffering in at least one instance from severe pain. While perhaps it is not too significant, there is no evidence she is now in pain. Dr. Morse describes her reacting to noxious stimuli  pain  as reflex but not indicative that she is sensing the pain as a functioning human being does. The reaction is described as stereotyped, and her reflexes show no adjustment that would indicate she mentally experiences pain.
The conversations with her mother and friends were theoretical ones. She was not personally involved. They were not made under the solemn and sobering fact that death is a distinct choice, See In re Estate of Brooks, 32 Ill.2d. 361, 205 N.E.2d. 435 (1965). Karen Quinlan, while she was in complete control of her mental faculties to reason out the staggering magnitude of the decision not to be "kept alive," did not make a decision. This is not the situation of a "living will" which is based upon a concept of informed consent.[10]
While the repetition of the conversations indicates an awareness of the problems of terminal illness, the elements involved  the vigor of youth that espouses the theoretical good and righteousness, the absence of being presented the question as it applied to her  are not persuasive to establish a probative weight sufficient to persuade this court that Karen Quinlan would elect her own removal from the respirator.
The breadth of the power to act and protect Karen's interests is, I conclude, controlled by a judicial conscience and morality which dictate that the determination whether or not Karen Ann Quinlan be removed from the respirator is to be left to the treating physician. It is a medical decision, not a judicial one. I am satisfied that it may be concurred in by the parents but not governed by them. This *261 is so because there is always the dilemma of whether it is the conscious being's relief or the unconscious being's welfare that governs the parental motivation.
It is also noted the concept of the court's power over a person suffering under a disability is to protect and aid the best interests. As pointed out, the Hart and Strunk cases deal with protection as it relates to the future life of the infants or incompetent. Here the authorization sought, if granted, would result in Karen's death. The natural processes of her body are not shown to be sufficiently strong to sustain her by themselves. The authorization, therefore, would be to permit Karen Quinlan to die. This is not protection. It is not something in her best interests, in a temporal sense, and it is in a temporal sense that I must operate whether I believe in life after death or not. The single most important temporal quality Karen Ann Quinlan has is life. This court will not authorize that life to be taken from her.
As previously indicated, equity follows the law. When positive statutory law exists, an equity court cannot supersede or abrogate it. The common law concept of homicide, the unlawful killing of one person by another, is reflected in our codified law. N.J.S.A. 2A:113-1, 2 and 5. The intentional taking of another's life, regardless of motive, is sufficient grounds for conviction. State v. Ehlers, 98 N.J.L. 236, 240-241 (E. & A. 1922); see People v. Conley, 64 Cal.2d 310, 49 Cal. Rptr. 815, 411 P.2d 911 (Sup. Ct. 1966). Humanitarian motives cannot justify the taking of a human life. See State v. Ehlers, supra, 98 N.J.L. at 240-241. The fact that the victim is on the threshold of death or in terminal condition is no defense to a homicide charge. State v. Mally, 139 Mont. 599, 366 P.2d 868, 873 (Sup. Ct. 1961).
New Jersey has adopted the principles of the common law against homicide. While some of the aforecited decisions are from other jurisdictions, they are reflections *262 of the common law and therefore dispositive of the manner in which this State would treat like circumstances. It is a reasonable construction that the law of this State would preclude the removal of Karen Quinlan from the respirator. As such, a court of equity must follow the positive statutory law; it cannot supersede it.[11]
A significant amount of the legal presentation to the court has involved whether the act of removing Karen from the respirator constitutes an affirmative act, or could be considered an act of omission.[12] An intricate discussion on semantics and form is not required since the substance of the sought-for authorization would result in the taking of the life of Karen Quinlan when the law of the State indicates that such an authorization would be a homicide.

III
The proceeding brings considerable attention and focus on the physical condition of Karen Quinlan. The results thereof are that in the future the decisions and determinations of the treating doctors and the hospital will be the subject of abnormal scrutiny.
The hospital, through amendment to the pretrial order, seeks a determination of "whether the use of the criteria developed and enunciated by the Ad Hoc Committee of Harvard Medical School on or about August 5, 1968, as well as similar criteria, by a physician to assist him in determination of the death of a patient whose cardiopulmonary functions *263 are being artifically sustained, is in accordance with ordinary and standard medical practice."
The scope of that request is extremely broad. It deals not with the question of Karen Quinlan but a theoretical patient. To the extent that it goes beyond this case, it is a request to make a determination in the abstract and not a proper subject for judicial determination. Crescent Park Tenants Ass'n v. Realty Eq. Corp. of N.Y., supra, 58 N.J. at 107.
Counsel for the hospital, in order to avoid the objection that the request deals in an abstraction and therefore constitutes a proscribed advisory opinion, suggests, by letter subsequent to trial, a refinement of the stated issue to refer specifically to Karen Quinlan.
The jurisdiction of the court to deal with such an issue must exist, if at all, under the authority of the Declaratory Judgment Act. Designed to provide judicial declaration of the rights and obligations of parties, the act is a device whereby uncertainty with respect to rights and legal relations may be alleviated. N.J.S.A. 2A:16-50 et seq., Union Cty. Bd. of Freeholders v. Union Cty. Park Comm'n, 41 N.J. 333, 336-337 (1964); Bergen Cty. v. Port of N.Y. Authority, 32 N.J. 303, 307 (1960); N.J. Home Builders Ass'n v. Div. on Civil Rights, 81 N.J. Super. 243, 251 (Ch. Div. 1963).
The controversy, however, must have matured and not be something sought in advance of its occurrence. Rego Industries Inc. v. American Mod. Metals Corp., 91 N.J. Super. 447, 453 (App. Div. 1966).
The application is prospective and in advance of the controversy. The doctors do not seek the determination  in fact, they oppose it.
Additionally, just as the matter of the nature and extent of care and treatment of a patient and therefore the patient's removal from a respirator is a medical decision based upon ordinary practice, so, too, is the decision whether a patient is dead and by what medical criteria. Whether *264 Karen Quinlan one day becomes brain-dead and therefore should be removed from the respirator is a decision that will have to be based upon the extant ordinary medical criteria at the time.

IV

A. Right of Privacy  Right of Self Determination

The "right of privacy," identified as such, was first recognized in Griswold v. Connecticut, 381 U.S. 479, 85 S.Ct. 1678, 19 L.Ed.2d 510 (1965). The source of this right has various explanations. Roe v. Wade, 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147 (1972).
Justice Blackmun, writing for the court in Wade, indicated:
The Constitution does not explicitly mention any right of privacy. * * * [T]he Court has recognized that a right of personal privacy, or a guarantee of certain areas or zones of privacy does exist under the Constitution. In varying contexts the Court or individual Justices have, indeed, found at least the roots of that right in the First Amendment * * *; in the Fourth and Fifth Amendments, * * *; in the penumbras of the Bill of Rights, * * * in the Ninth Amendment * * *; or in the concept of liberty guaranteed by the first section of the Fourteenth Amendment, * * *. These decisions make it clear that only personal rights that can be deemed "fundamental" or "implicit in the concept of ordered liberty, * * * are included in this guarantee of personal privacy. [410 U.S. at 152, 35 L.Ed.2d at 176, 92 S.Ct. at 726, citations omitted]
Plaintiff suggests, citing Griswold in concert with Union Pacific Railway Co. v. Botsford, 141 U.S. 250, 11 S.Ct. 1000, 35 L.Ed. 734 (1891), that the right of self determination and right of privacy are synonymous.[13] He also suggests the right is exercisable by a parent for his child.
It is not significant to this opinion whether the right of self-determination is within the scope of the right of privacy. *265 What is significant is the extent to which it is subject to a compelling state interest, Roe v. Wade, supra, and whether the right can be exercised by the parent for his child.
The majority of cases dealing with the refusal of an individual to accept treatment which created an exposure to death involved mature, competent adults. U.S. v. George, 239 F. Supp. 752 (D. Conn. 1965); In re Osborne, 294 A.2d 372 (D.C. Ct. App. 1972); In re Brooks Estate, supra; In re Yetter, 62 Pa. D. & C.R.2d 619 (C.P. 1973); John F. Kennedy Memorial Hospital v. Heston, supra (the competency of the adult to make the decision at the specific instance was questionable because of her condition of shock). None, however, dealt with an incompetent adult, as here, totally unaware of the problem.
The disability places the court in a parens patriae circumstance, significantly different from the instance of a competent adult's effort to control his body. This is true in spite of the prior statements of Karen Quinlan concerning dispensing with extraordinary care. For, as indicated, the proofs do not meet a standard clear enough to have the probative weight sufficient to convince the court that Karen Quinlan, in full command of the facts, would favor death.
The judicial power to act in the incompetent's best interest in this instance selects continued life, and to do so is not violative of a constitutional right.
The majority of the right-of-privacy cases, Roe v. Wade, supra (abortion); Eisenstadt v. Baird, 405 U.S. 438, 92 S.Ct. 1029, 31 L.Ed.2d 349 (1972) (contraception), Griswold v. Connecticut, supra (contraception); Stanley v. Georgia, 394 U.S. 557, 89 S.Ct. 1243, 22 L.Ed.2d 542 (1969) (possession of obscene films for own personal viewing), involved a claim which asserted a life practice for the individual involved. The compelling state interest found lacking in Wade, Baird, Griswold and Stanley is appropriate here in the State's interest in preservation of life and the extension of the court's protection to an incompetent. John F. Kennedy Memorial Hospital v. Heston, supra.
*266 The power of the parents to exercise the constitutional right is found lacking on several grounds: First, the only cases where a parent has standing to pursue a constitutional right on behalf of an infant are those involving continuing life styles. Wisconsin v. Yoder, infra; Pierce v. Society of Sisters, 268 U.S. 510, 45 S.Ct. 571, 69 L.Ed. 1070 (1925); Meyer v. Nebraska, 262 U.S. 390, 43 S.Ct. 625, 67 L.Ed. 1042 (1923). Second, the parents urged Dr. Morse to do everything at the outset to save Karen's life. The parents now ask him to abandon his conscience and allow her life to end. In Roe v. Wade the court refused to hold that the right of privacy included the unlimited right to body control. In a like manner, the right to privacy, being urged through a parent, must be fettered when in conflict with a doctor's duty to provide life-giving care.[14]
There is no constitutional right to die that can be asserted by a parent for his incompetent adult child.

B. Free Exercise

Religious beliefs are absolute under the Free Exercise Clause but practice in pursuit thereof is not free from governmental regulation. Reynolds v. United States, 98 U.S. 145, 25 L.Ed. 244 (1878); Prince v. Massachusetts, 321 U.S. 158, 64 S.Ct. 438, 88 L.Ed. 645 (1944); Sherbert v. Verner, 374 U.S. 398, 83 S.Ct. 1790, 10 L.Ed.2d 965 (1963). The imposition of the regulation can be based on "only those interests of the highest order". Wisconsin v. Yoder, 406 U.S. 205, 92 S.Ct. 1526, 32 L.Ed.2d 15 (1972). "To have the protection * * * the claims must be rooted on religious belief." Id. at 215, 92 S.Ct. at 1533, 32 L.Ed.2d at 25.
The religious belief here asserted is twofold: (1) that the discontinuance of extraordinary care to Karen Quinlan is not a mortal sin, and (2) to interfere with her natural *267 body functions prevents her from reaching a better life in the hereafter.
The absence of mortal sin contention is based, according to Father Trapasso, on the Papal allocutio of November 24, 1957, and Roman Catholic traditions and morals. The impetus of the thought is that it is neither a mortal sin to continue nor discontinue "extraordinary" means of support for the body functions. The court does not consider the "extraordinary" versus "ordinary" discussions viable legal distinctions. The essence of the contention is that it is optional with the Roman Catholic involved, and to do either does not conflict with the teachings of the Church. It is not a dogma of the Church. It is not a claim "rooted in religious belief." There is no governmental or other interference with religious belief here that is caused by the court's refusal to authorize the termination of the respirator.
The temporal world is what the Free Exercise Clause deals with  not the hereafter. All instances where a religious belief has been freed of attempted governmental interference dealt with life styles and life circumstances.
In John F. Kennedy Memorial Hospital v. Heston, 58 N.J. 576, 580 (1971), Justice Weintraub indicated "it seems correct to say there is no constitutional right to choose to die." In doing so the court recognized the State's interest in preserving life. Equally, this court recognizes the State's interest in preserving life, particularly in this instance where the court sits in the capacity of parens patriae. There is a presumption that one chooses to go on living. The presumption is not overcome by the prior statements of Karen Quinlan. As previously noted, she did not make the statements as a personal confrontation. Additionally, it is not Karen who asserts her religious belief but her parents. In those instances where the parental standing to assert the religious belief has been upheld, it dealt with future life conduct of their children, not the ending of life. Wisconsin v. Yoder, 406 U.S. 205, 92 S.Ct. 1526, 32 L.Ed. 2d *268 15 (1972); Pierce v. Society of Sisters, 268 U.S. 510, 45 S.Ct. 571, 69 L.Ed. 1070 (1925).
The right to life and the preservation of it are "interests of the highest order," and this court deems it constitutionally correct to deny plaintiff's request.

C. Cruel and Unusual Punishment

It is argued that to deny the suspension of the "futile use of extraordinary measures after the dignity, beauty, promise and meaning of earthly life have vanished," is cruel and unusual punishment proscribed by the Eighth Amendment of the United States Constitution.
The nature and scope of the cruel and unusual punishment concept is set forth in Furman v. Georgia, 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346, reh. den. 409 U.S. 902, 93 S.Ct. 89, 34 L.Ed.2d 164 (1972). All of the concurring and dissenting opinions in Furman make it clear that the proscription is directed to state-imposed criminal sanctions, not the situation presented here. Justice Douglas in his concurring opinion, in discussing the fact that the Eighth Amendment may have found its source in the English Bill of Rights of 1689, indicates the concern was "primarily with selective or irregular application of harsh penalties and that its aim was to forbid arbitrary and discriminatory penalties of a severe nature." Id. at 242, 92 S.Ct. at 2728, 33 L.Ed.2d at 351. The impetus for the concept was to preclude judicial or legislative imposition of punishment in the guise or nature of criminality.
Plaintiff cites the following language of Justice Brennan's concurring opinion in Furman for his contention:
The primary principle is that a punishment must not be so severe as to be degrading to the dignity of human beings. [at 271, 92 S.Ct. at 2742]

* * * * * * * * *
[T]he State must not arbitrarily inflict a severe punishment. This principle derives from the notion that the State does not respect human dignity when, without reason, it inflicts upon some people a *269 severe punishment that it does not inflict on others. [at 274, 92 S.Ct. at 2744]

* * * * * * * * *
A third principle inherent in the Clause is that a severe punishment must not be unacceptable to contemporary society. Rejection by society, of course, is a strong indication that a severe punishment does not comport with human dignity. [at 277, 92 S.Ct. at 2746]

* * * * * * * * *
The final principle inherent in the Clause is that a severe punishment must not be excessive. A punishment is excessive under this principle if it is unnecessary: The infliction of severe punishment by the State cannot comport with human dignity when it is nothing more than pointless infliction of suffering. [at 279, 92 S.Ct. at 2747]
A careful reading of these principles does not support plaintiff here. Continuation of medical treatment, in whatever form, where its goal is the sustenance of life, is not something degrading, arbitrarily inflicted, unacceptable to contemporary society or unnecessary.
The Eighth Amendment has no applicability to this civil action.

V
Joseph Quinlan applies to be appointed guardian ad litem of his daughter's person and property. Karen Quinlan is incompetent and unfit and unable to govern herself as to manage her affairs. R. 4:83-2. As next of kin Mr. Quinlan qualifies to be her guardian, N.J.S.A. 3A:6-36, unless it is shown his appointment would be contrary to Karen's best interest. In re Roll, 117 N.J. Super. 122 (App. Div. 1971). The guardian ad litem opposes his appointment.
The responsibility of the guardian over property is to manage the business affairs of the incompetent. There is no reason why Mr. Quinlan should not serve in this capacity.
The responsibility of the guardian over the person of the incompetent is to make the decisions, in this instance, that relate to her welfare, insofar as those decisions are within the person's control. I have ruled that it is a medical *270 decision whether or not Karen should be removed from the respirator. Just as that decision is a medical one, the continued care and treatment of Karen is a medical one. There will be, however, from time to time medical decisions relating to further treatment that will require a guardian's counsel, advice and concurrence. This is reflected by the testimony of Dr. Morse.
Mr. Quinlan impressed me as a very sincere, moral, ethical and religious person. He very obviously anguished over his decision to terminate what he considers the extraordinary care of his daughter. That anguish would be continued and magnified by the inner conflicts he would have if he were required to concur in the day-by-day decisions on the future care and treatment of his daughter. These conflicts would have to offset his decision making processes. I, therefore, find it more appropriate and in Karen's interests if another is appointed.
For the same reasons, I do not feel Mrs. Quinlan should be appointed.
Daniel Coburn, Esq., who has acted on Karen's behalf throughout this proceeding, is appointed the guardian of her person. Both guardians shall serve without bond in accordance with law and the rules of court, after qualification.
Judgment should be submitted accordingly.
NOTES
[1] See Bellegie, "Medical Technology As It Exists Today," 27 Baylor L. Rev. 31, 32, describing the functioning of a respirator, wherein the author states, "This apparatus can maintain a person's respiratory functions indefinitely, and does so on many occasions where it is a matter of life and death."
[2] The court notes the descriptions of the medical terms, the medical tests, the bodily functioning and related information contained in this opinion are based upon its understanding of the testimony and terms used, and are provided as a necessary essential to the opinion but are not intended to be exhaustive or medically precise.
[3] Crescent Pk. Tenants Ass'n v. Realty Eq. Corp. of N.Y., 58 N.J. 98, 107 (1971); In re Judges in Chancery, 101 N.J. Eq. 9 (Ch. 1927).
[4] See Tucker v. Lower, No. 2831 (Ct. of L. & Eq. Richmond, Va., May 23, 1972); People v. Lyons, 15 Crim. L. Rptr. 2240 (Cal. Super. Ct. May 21, 1974); State v. Brown, 8 Or. App. 72, 491 P.2d 1193 (Ct. App. 1971); In re New York City Health and Hospitals Corp. v. Sulsona, 81 Misc.2d 1002, 367 N.Y.S.2d. 686 (Sup. Ct. 1975); Symposium Issue  Euthanasia, 27 Baylor L. Rev. 10 (1975); Berman "The Legal Problems of Organ Transplantation," 13 Vill. L. Rev. 751 (1968); Note, "The Time of Death  A Legal Ethical and Medical Dilemma," 18 Cath. Law. 242 (1972).
[5] It is suggested that to make "the life or death" decision here involves apotheosis and should therefore be avoided entirely. It is the nature of the judicial process, once set in motion, to deal with an issue no matter how grave its consequences. To carry out the judicial process, I most humbly suggest is NOT an effort to exercise Divine Powers.

The onus of the judicial process for me, in this instance, is unparalleled.
[6] This court sits as the general equity part of the Chancery Division of the Superior Court. The New Jersey Constitution, vesting original general jurisdiction in the Superior Court, divides it into the Appellate, Law and Chancery Divisions. N.J. Const. (1947), Art. VI, § III, pars. 2 & 3. The Law and Chancery Divisions, subject to rules of the Supreme Court, each possess the power and functions of the other to dispense legal and equitable relief. Id., Art. VI, § III, par. 4. The Supreme Court Rules provide that if the principal relief sought is equitable in nature, an action is to be commenced in the Chancery Division. R. 4:3-1(a)(1). See Steiner v. Stein, 2 N.J. 367 (1949), and Fleischer v. James Drug Stores, 1 N.J. 138 (1948), for the significance and manner of cases instituted in Chancery involving equitable and legal issues. Further, the exercise of jurisdiction by a court of equity is discretionary and may extend to declaratory relief, although it is not within the inherent equitable jurisdiction. Unterman v. Unterman, 19 N.J. 507, 515 (1955): But see Government Employees Ins. Co. v. Butler, 128 N.J. Super. 492 (Ch. Div. 1974).
[7] This does not preclude the setting of a precedent; it merely requires the setting to be within the concept of judicial conscience.
[8] The advent of life supportive techniques and advanced medical knowledge have raised a controversy over an adequate legal definition of death.

Black's Law Dictionary (4 ed. rev. 1968), 488, defines death as
The cessation of life; the ceasing to exist; defined by physicians as a total stoppage of the circulation of the blood, and a cessation of the animal and vital functions consequent thereon, such as respiration, pulsation, etc.
The difficulty with a definition which involves blood circulation develops in clinical situations, as present here, where the patient's cardio-respiratory system is mechanically supported, causing the blood to circulate and the related vital functions to continue. There obviously can be no death under Black's traditional definition as long as the heart and lungs remain intact. Yet, all other signs of life as reflected in the Ad Hoc Committee of Harvard Medical School can cease.
In clinical situations, such as the case at bar, the need for adoption of brain death as a legal definition is urged by many authorities. The establishment of an appropriate modern-day legal definition of death and the criteria to be followed are the subject of a plethora of written material, some of which are: Ad Hoc Committee of the Harvard Medical School to Examine the Definition of Brain Death, Report, "A Definition of `Irreversible Coma'", 208 J.A.M.A. 85 (1968); A Statement of the Cerebral Survival Program by The Project Directors, Cerebral Survival Program (performed under contracts with NINDS, Collaborative and Field Research), National Institute of Health, Bethesda, Md.; Task Force on Death and Dying of the Institute of Society, Ethics, and the Life Sciences, Report, "Refinements in the Criteria for the Determination of Death: An Appraisal," 221 J.A.M.A. 48 (1972); Capron and Kass, "A Statutory Definition of the Standard for Determining Human Death: An Appraisal and a Proposal", 121 U. Pa. L. Rev. 87 (1972); Friloux, "Death, When Does It Occur?" 27 Baylor L. Rev. 10 (1975); Halley & Harvey, "Medical vs. Legal Definitions of Death", 204 J.A.M.A. 103 (1968); Hirsh, "Brain Death", 21 Med. Tr. Tech. Q. 377 (1975).
[9] See Epstein, The Role of the Physician in Prolongation of Life, Controversies in Medicine II (1973).
[10] Kutner, "The Living Will  Coping With The Historical Event of Death," 27 Baylor L. Rev. 1, 39 (1975).
[11] Certainly the question must be asked, did the common law contemplate the continued existence of a human being, where that human being, although medically and legally alive, has been given all the diagnostic and therapeutic treatment available, and should not the natural functions of that human being be permitted to progress in a normal way without the law against homicide being a deterrent?
[12] For a complex and reasoning discussion on these issues, see Fletcher "Prolonging Life," 42 Wash. L. Rev. 999 (1967).
[13] See Sharp v. Crofts "Death with Dignity The Physician's Civil Liability," 27 Baylor L. Rev. 88, 89 (1975); contra, Byrn "Compulsory Lifesaving Treatment for the Competent Adult," 44 Fordham L. Rev. 1 (1975).
[14] These arguments are equally valid under the Free Exercise claim.