LEACH, GUARDIAN, *v.*
AKRON GENERAL MEDICAL CENTER ET AL.

(No. C80-10-20 — Decided December 18, 1980.)

Court of Common Pleas of Summit County, Probate Division.

*Mr. William L. Curtice,* for plaintiff.
*Ms. Elizabeth A. Reilly,* guardian ad litem, *pro se.*
*Buckingham, Doolittle & Burroughs Co., L.P.A.,* and *Mr. Gary A. Banas,* for defendants.
*Mr. Stephan M. Gabalac,* prosecuting attorney, and *Mr. Timothy M. Hartman,* for intervening defendant.

SPICER, J. Edna Marie Leach is a seventy-year-old housewife and the mother of two children, Roy A. Leach and Mary E. Hoyt. Neither child resides with his parents. Roy lives in Akron and Mary in Phoenix, Arizona. Mrs. Leach has a number of brothers and sisters. Gifford Leach, her husband, is a retired laborer from B. F. Goodrich Company. Edna and Gifford reside in a modest home which they own as tenants in common. Mrs. Leach has no valuable assets other than three small insurance policies and two bank accounts. If Mrs. Leach were to die, Mr. Leach would be the beneficiary of the insurance proceeds, and the children would share the accounts. Most of all hospital and medical costs are covered by either Medicare or Goodrich.

Mrs. Leach was an energetic woman who enjoyed good health until two years ago. At that time, she developed a problem in her lower back, which became a marked weakness of most of the muscles of her lower extremities. This condition caused her to walk in a bent-over position. On June 11, 1980, she entered a hospital and her condition was diagnosed as amyotrophic lateral sclerosis, a progressively deteriorating, disabling disease of the nervous system.

Mrs. Leach was informed by her treating physician, Dr. Howard Shapiro, of the disease and that it would be terminal within three to five years. He further informed her she would be incapacitated. Mrs. Leach's condition deteriorated and she was admitted to Akron General Medical Center on July 27, 1980, in a stuporous condition with difficulty in breathing. After some improvement in the early hours of July 29th, Edna suffered a cardiac arrest. Cardio-pulmonary resuscitation was administered and Mrs. Leach's heartbeat was quickly restored. She was then placed on a life support system.

The life support system consists of a respirator, a nasogastric tube, and a catheter. The respirator is for breathing and enters the body through a tube inserted in an incision in the trachea. The nasogastric tube is for feeding and consists of a tube entering the nose and extending into the stomach. The catheter is for bladder elimination. Mrs. Leach has been on that system for just over four months. During that four-month period she has not responded or shown any recognition of attempts to communicate with her. She does not move her extremities. She cannot breathe on her own. She does react to deep pain by grimacing. Her eyes react to light stimuli. There is eye movement. However, the eye movement is not associated with cognitive recognition. EEG scans have shown very low brain activity. Her state of being is described as semi-comatose, or chronic vegetative.[1] Attempts have been made to wean her from the respirator with no success. Mrs. Leach's present condition is the result of amyotrophic lateral sclerosis, or cardiac arrest, or some combination thereof.

Mrs. Leach's condition is a continuing anxiety to her family. In addition, it constitutes an expense approximating $500 a day to her insurance company. Mr. Leach, observing his wife's condition, contacted Dr. Shapiro and requested that the use of the respirator be terminated. On October 13, 1980, Dr. Shapiro responded with a letter stating her condition to be "hopeless" and "her ultimate demise is only a matter of time," but he refused to end her life support. Dr. Shapiro further indicated that life support could only be terminated by court order.

Mr. Leach sought legal counsel. On the basis of Mrs. Leach's incompetency, Mr. Leach, by this court, was appointed her legal guardian. Mr. Leach and Mrs. Leach's two children then instituted this action for an order to discontinue life supports of Edna Marie Leach. Pursuant to that request, this court, after having appointed Elizabeth A. Reilly as guardian ad litem, ordered the matter set for evidentiary hearing. On November 4 and 5, 1980, an evidentiary hearing was held. Additional evidence was taken on December 2, 1980. A total of 17 witnesses testified. Much of the testimony was directed towards two areas: Mrs. Leach's desires in reference to being

[1] See 1C Attorneys' Textbook of Medicine (3 Ed. 1980), Chapter 29A, paragraph No. 29A. 70, pages 29A-45 to 29A-46.

placed on a life support system, and the prognosis for Mrs. Leach's survival. Mr. Leach, Helen Carr, a friend, Mrs. Carpenter, a sister, Patsy Novoselich, a friend, Avis Joseph, a cousin, and Annaleisa Manning, a cousin, all testified as to numerous conversations concerning life support systems. In each of those conversations, Mrs. Leach expressed a desire, if ill, not to be placed on a life support system. The last of those conversations took place in Mrs. Leach's bedroom only two days prior to her entering the hospital. Mrs. Carr recalled one conversation in which Mrs. Leach said:

"That's the one thing that terrifies me. I don't want to be put on life support systems. I don't want to live if I have to be a vegetable."

Robert Crawford, Mrs. Leach's pastor, testified that while he had not discussed life supports with her, he did say that nothing in the family's request "violates the tenets of her faith or of my church."

As to the prognosis of Mrs. Leach's future health, three neurologists testified: Dr. Howard Shapiro, Dr. Harvey Friedman and Dr. Richard J. Lederman. Dr. Shapiro was called by the guardian and Doctors Friedman and Lederman by the guardian ad litem. Each doctor is a specialist in treating the nervous system and brain diseases such as amyotrophic lateral sclerosis, and each has conducted a physical examination of Mrs. Leach. All three agreed that Mrs. Leach was not dead under any accepted medical standard. All three agreed that she suffered from amyotrophic lateral sclerosis, which is terminal, and that there is no known treatment for such a disease. All agreed that she suffered brain damage. Doctors Friedman and Lederman stated she has suffered irreversible brain damage. Dr. Friedman said:

"I think, unequivocally, she has suffered irreversible brain damage."

Dr. Lederman said:

"In my opinion, there can be no question that she has suffered extensive central nervous system or brain damage. By all the criteria that we have gathered over the years, this level of functioning would be considered almost certainly irreversible in its major degree."

When asked whether Mrs. Leach was cognitive, all agreed she was not, and that it was unlikely that she would ever

regain consciousness. Dr. Lederman and Dr. Friedman stated that it was "highly" unlikely. Dr. Lederman stated:

"Well, there is, of course, no—no one could ever say that it can't happen. However, I am unfamiliar with a single case in the medical literature of this degree of disfunction with this cause, and I am emphasizing that in a patient of this age."

All agreed that if taken off the respirator, she would die within minutes or hours, and continuing her on it served no medical goal other than sustaining her respiration. Finally, all agreed there is no known treatment to help Mrs. Leach.

## FINDINGS OF FACT

From the testimony and exhibits presented, this court specifically finds the following:

(1) that Edna Marie Leach is suffering from amyotrophic lateral sclerosis, a terminal illness of the nervous system;

(2) that she has suffered irreversible brain damage;

(3) that she is in a permanent, chronic, vegetative state;

(4) that she is not now cognitive and, within a reasonable medical certainty, it is highly unlikely and remote that her cognitive powers will be restored;

(5) that there is no known treatment that can be administered with any expected success;

(6) that Edna Marie Leach, in her present physical condition, if competent, would elect not to be placed on or continued on life supports; and

(7) that Gifford Leach, Roy Leach, and Mary Hoyt's sole motive for bringing this action is to end their wife and mother's present vegetative condition.

## CONCLUSIONS OF LAW
## THE PROBLEM

When an individual is suffering from an incurable, terminal disease and is in a permanent vegetative state with no hope of regaining cognitive or sapient powers, may this court grant an order for discontinuation of a respirator sustaining what minimal life that remains? That, simply stated, is the problem and question this court must answer. This, of course, is a court of law, and it must be guided by the law of its jurisdiction.

However, Ohio has no law or precedent dealing with a matter similar to the one now faced by this court. There is no case law or statutory law within the court's jurisdiction to

directly guide it in answering the questions and problems placed before it. Case law that does pertain can be found outside the state of Ohio. Even there, only a few states have ruled on the question. The reason for the lack of law in the area of life supports is the newness of their success and the importance to society of the questions and answers posed by their use. Not many years ago, questions dealing with death or the point of death were not as complex. Death occurred when the lungs ceased and the heart stopped. *Evans* v. *Halterman* (1928), 31 Ohio App. 175, 165 N.E. 869. With the advance of medical technology the heart and lungs can be prevented from stopping and can be sustained on life support systems for indefinite periods. With this advance, a new set of complex problems is presented to the legal and medical community.

When does death occur—when the heart ceases or brain function ends? While it is an interesting and important problem, it is one that does not appear to be answered in Ohio.[2] That is not the problem this court faces. The problem that this court faces does grow out of the same genesis, *i.e.,* life support systems. In this case, Edna Marie Leach's brain is not dead. Edna Marie Leach's brain is functioning. It is functioning at the lowest possible level. While she cannot be classified as dead, she can be classified as being very near death, and that is the crux of the problem.

The problem before this court is not life or death. That question has already been decided. Edna Marie Leach is going to die. She is on the threshold of death, and man has, through a new medical technology, devised a way of holding her on that threshold. The basic question is how long will society require Mrs. Leach and others similarly situated to remain on the threshold of certain death suspended and sustained there by artificial life supports. Since, man, through his ingenuity, has created a new state of human existence—minimal human life sustained by man-made life supports—it must now devise and fashion rules and parameters for that existence. That is the business this court is faced with. It is not an easy question to answer. It deals with many of our most basic legal, medical and moral concepts. However, it is a question that must be answered.

---

[2] 10 Akron L. Rev. 145, at pages 146-150.

## AUTHORITY IN JURISDICTIONS OTHER THAN OHIO

While considerable law exists on the question of treatment, only five states have addressed the question as posed to this court, that is, treatment of the terminally ill, incompetent individual. *In re Quinlan* (1975), 137 N.J. Super. 227, 348 A. 2d 801, modified and remanded (1976), 70 N.J. 10, 355 A. 2d 647, certiorari denied *sub nom. Garger* v. *New Jersey,* 429 U. S. 922; *Supt. of Belchertown State School* v. *Saikewicz* (1977), 373 Mass. 728, 370 N.E. 2d 417; *Matter of Spring* (Mass. 1980), 405 N.E. 2d 115; *Satz* v. *Perlmutter* (Fla. App. 1978), 362 So. 2d 160; *Matter of Eichner* (1980), 73 A.D. 2d 431, 426 N.Y. Supp. 2d 517; *Severns* v. *Wilmington Med. Ctr.* (Del. Sup. Ct. Sept. 23, 1980), 49 U.S.L.W. 2262.

The first state, New Jersey, in the highly discussed *In re Quinlan, supra,* set the precedent by applying the constitutionally guaranteed right of privacy in allowing the removal of life supports. Since *Quinlan,* with slight variations, each court that has faced similar factual patterns as *Quinlan, i.e.,* either withdrawing or withholding treatment, has followed its lead. Of the six cases cited, the one that is the closest in fact pattern to the case at bar is the New York decision, *Matter of Eichner, supra.*

In *Eichner,* an eighty-three-year-old Catholic Brother suffered cardiac arrest and was revived, only to be placed on life supports. The trial court found him to be in a permanent, chronic, vegetative state and granted the motion to have his respirator terminated. As part of its finding of fact, the court specifically found that if Brother Fox were competent, he would have requested that he not be put on a respirator.

On appeal, the New York Supreme Court, Appellate Division, Second Department, affirmed the lower court, and as in *Quinlan,* based its affirmance on the right of privacy. The court, in a lengthy opinion, began by citing its equitable powers (*parens patriae*) over mental incompetents.

The court then went on to discuss the constitutional questions. It found in *Roe* v. *Wade* (1973), 410 U. S. 113 and *Doe* v. *Bolton* (1973), 410 U. S. 179, the fundamental right of privacy over matters of personal integrity, including control over one's body. The court indicated that a terminally ill, but competent person, has the right to choose medical treatment. It said at (73 A.D. 2d) pages 458 to 459:

"***[T]he constitutional right to privacy, we believe, encompasses the freedom of the terminally ill but competent individual to choose for himself whether or not to decline medical treatment where he reasonably believes that such treatment will only prolong his suffering needlessly, and serve merely to denigrate his conception of the quality of life.***"

Further, the court said the right must be applied to incompetents as well as competents:

"We further conclude that by standards of logic, morality and medicine the terminally ill should be treated equally, whether competent or incompetent.***" *Id.,* at page 464.

In the next step in its decisional process, the court used a balancing test as exemplified and required by *Roe* v. *Wade, supra.* Brother Fox's right of privacy was weighed against the state's interest in preserving his life. The court found under the law of New York and the specific facts involved in Brother Fox's situation that there was no "compelling state interest" sufficient to outweigh his right to decide medical treatment. Further, the court emphasized that the individual's right to decide treatment would attach only when the medical prognosis showed that individual to be terminally ill, in a permanent, vegetative state, with the possibility of regaining cognitive brain function extremely remote.

Finally, the court turned to examination of how Brother Fox's right could be exercised:

"***We cannot but emphasize that there must exist a mechanism to ascertain and to implement the patient's consent. To deny the exercise because the patient is unconscious is to deny the right.***" *Id.,* at page 470.

The first mechanism the court settled on was by the expression of the individual himself (specific intent), either by a living will or by his oral expression, as exemplified by Brother Fox's statement as to life supports. If the incompetent has not expressed himself sufficiently, then the second mechanism would be made by the *parens patriae* concept of substitute judgment.

As has been stated, the foregoing outline of the *Eichner* decision is in line with other state court rulings dealing with either withholding or withdrawing life supports from terminally ill, incompetent individuals. Each court that has been faced with the question has used the same constitutional right

of privacy as the legal basis for its decision. Faced with such unanimity, it would be difficult to deny the existence of the right of a terminally, incurably ill and permanently semi-comatose person to decide his or her own treatment. This court is in agreement that such a right is guaranteed by the Constitution of the United States. The only remaining question is: Is there some compelling state interest that might override that right? For the answer, we must look to the factual situation of the case at bar and Ohio law.

## APPLICABLE OHIO LAW

The Constitutional right to privacy is paramount to a state interest unless that interest can be demonstrated to be compelling or outweighs the individual's Constitutional right. *Griswold* v. *Connecticut* (1965), 381 U. S. 479, 484; *Eisenstadt* v. *Baird* (1972), 405 U. S. 438, 453; *Roe* v. *Wade, supra.* That is the test that this court must apply under the particular facts of this case in determining if Ohio law can prevent the exercise of Edna Marie Leach's right to decide medical treatment. On one side of the scale, this court must place a constitutionally protected right; on the other, any potential interest, either societal or legal, that the state might wish to protect. What potential interest? Generally, four basic areas of interest have been identified: Preservation of life; protection of third parties; maintenance of the ethical integrity of the medical profession; and, prevention of suicide. *Eichner, supra,* at pages 465-467; *Quinlan, supra.*

*Preservation of life*: Does the state of Ohio benefit by preserving Edna Marie Leach's life in its present condition? This court can see no possible benefit to the state by briefly extending the minimal life of an incurably ill, seventy-year-old, semi-comatose woman. It can see a number of negative detriments to the state, Edna Marie Leach, and her family in attempting not to preserve life, but in attempting to momentarily delay death. The state's interest in preserving the life of Edna Marie Leach does not outweigh her right to decide her own medical treatment.

*Protection of third parties*: What third parties would suffer if Edna Marie Leach's respirator were to be terminated? Her husband and children have joined in asking this court for a discontinuation of life supports. A parade of friends and relatives have testified of their uneasiness with Mrs. Leach's

present condition and her desire "not to be a burden," "not to be put on a machine." It would appear to this court that allowing Mrs. Leach's wishes to be granted would relieve those most concerned with her well-being. We are not faced with a situation as existed in *Application of President & Directors of Georgetown Coll.* (C.A.D.C. 1964), 331 F. 2d 1000, where treatment (blood transfusion) was ordered for a mother of a small child. The interest of the state was clear in that case—to prevent abandonment of the child. The interest of the third parties is minimal or does not exist in this case, and must be outweighed by the incompetent's right in question.

*Maintenance of the ethical integrity of the medical profession*: A lengthy discussion exists of modern medical practice and professional attitudes toward life supports in both *Quinlan, supra* (70 N.J.), at pages 42 to 51, and *Eichner, supra,* at page 463. In both cases, those courts could find no reason to imply that the withdrawal of any extraordinary life support system for the terminally ill in an irreversible, vegetative coma is inconsistent with the current state of medical ethics. This court was not presented with any evidence, nor is it aware of any peculiarity of the medical profession in Ohio, that would disturb that observation.

*Prevention of suicide*: Ohio has no penalties for suicide. However, criminal prosecution could be considered under any one of Ohio's murder or complicity statutes. R. C. 2903.01(A), 2903.11(A)(1), 2903.12(A), 2903.13(A), 2923.01(A), and 2923.02(A). Suicide requires a specific intent to die. Withdrawal of a respirator evinces only an intent to forego extraordinary measures, and allows the processes of nature to run their course. This court does not consider the facts of the case before it to present a realistic or prosecutable case of suicide. The court notes with interest the prosecutor's comment that there is no report of a case of this nature being brought to trial. The state's interest in preventing suicide does not exist in the case at bar. It is therefore outweighed by the incompetent, incurable individual's right to elect treatment.

On the basis of the above analysis, this court concludes that no state interest, either legal or societal, exists to the degree necessary to outweigh the Constitutional right of Edna Marie Leach, an incompetent suffering from a terminal illness, to choose medical treatment.

## BURDEN OF PROOF

The guardian ad litem raises the question of the standard of proof to be used in weighing the evidence considered by this court. The guardian ad litem suggests the standard of beyond a reasonable doubt. Beyond a reasonable doubt is a burden reserved for criminal cases. *Addington* v. *Texas* (1979), 441 U. S. 418, 428. The burden normally used in a civil matter is preponderance of the evidence, *Cincinnati H. & D. Ry. Co.* v. *Frye* (1909), 80 Ohio St. 289, or in a limited number of civil cases, the higher standard of "clear and convincing," *Merrick* v. *Ditzler* (1915), 91 Ohio St. 256. There does not appear to be sufficient authoritative case law for the proposition that the criminal standard should be applied to civil cases, 21 Ohio Jurisprudence 2d, Evidence, Section 700. In *Eichner, supra,* at page 468, the court rejected reasonable doubt as its standard and said:

"***Under the circumstances present herein, by no stretch of the imagination can the State be deemed to be 'taking life' in a manner analogous to the imposition of a death penalty in a criminal action. This judicial proceeding is not directed towards the imposition of a penalty for criminal activity but, rather, towards the furtherance of the best interests of the comatose and terminally ill patient.***"

The matter before this court is civil in nature (R. C. Chapter 2111), and this court can find little support for applying the criminal standard of beyond a reasonable doubt. However, because of the nature and importance of the issues involved, this court would be remiss if it did not adopt the highest possible civil standard of clear and convincing. *Ayres* v. *Cook* (1942), 140 Ohio St. 281; *Flax* v. *Williams* (1937), 25 Ohio Law Abs. 680. The burden of proof adopted by this court is clear and convincing.

In its brief, Akron General Medical Center appears to be requesting an even higher burden of proof—that all witnesses concur. The court rejects such a notion. This court knows of no rule of law, either criminal or civil, that requires a concurrence of witnesses in their testimony. To require such a rule would take the decision processes from the trier of facts and give it to any witness who, for whatever motive, wanted to prevent the relief sought. It is up to the trier of fact to weigh each witness' testimony and give whatever weight it deems proper. *Mieritz* v. *Insurance Co.* (1901), 8 O.N.P. 422.

## CONCLUSIONS

The following are the conclusions of law of this court in the matter of Edna Marie Leach:

(1) The Constitution of the United States, as part of the right to privacy, guarantees to an incurably, terminally ill person, who is in a permanent, vegetative state, the right to decide future medical treatment.

(2) The facts of the case at bar do not demonstrate any compelling state interest paramount to or that outweighs the above right.

(3) The standard of proof required in cases of this nature is clear and convincing.

(4) Edna Marie Leach, being an incurably, terminally ill person, and in a permanent vegetative state, has the right of deciding medical treatment.

(5) As indicated in the Findings of Fact of this court, *supra,* Edna Marie Leach, if competent, would elect not to be placed on life supports.

(6) It is, therefore, the further finding of this court that the motion of her guardian, Gifford Leach, to terminate the respirator she presently is on, is well taken and should be granted.

## ORDER

It is, therefore, the order of this court that Gifford H. Leach, Guardian of Edna Marie Leach, is empowered and authorized to direct a discontinuation of the respirator presently assisting Edna Marie Leach. However, the following conditions must be complied with prior to the act of discontinuation:

(1) A licensed physician and neurologist selected by the guardian must examine and then certify that Edna Marie Leach continues in a permanent vegetative state, and that there is no reasonable medical possibility that she will regain any sapient or cognitive function.

(2) A forty-eight hour notice of the examination must be given to the Summit County Coroner and Prosecutor. The Coroner's and Prosecutor's Office may have a witness or witnesses present at the examination.

(3) When the examination is complete, a forty-eight hour notice of the act of discontinuation must be given to the Summit County Coroner's and Prosecutor's Office. The Coroner's

and Prosecutor's Office may have a witness or witnesses present at the act of discontinuation.

It is the further order of this court, that if upon compliance with the above condition, the respirator is removed and death should occur, the cause of death shall be attributed to the natural causes which have contributed to Edna Marie Leach's illness. Such act of discontinuation shall not give rise to either civil or criminal liability on the part of any participant, guardian, physician, hospital or others.

The authorization extends only to the removal of the respirator and to no other life supports.

*Judgment accordingly.*