432 So.2d 611 (1983)
JOHN F. KENNEDY MEMORIAL HOSPITAL, INC., a Florida Corporation; Gladys Landy, Individually and As the Duly Appointed Guardian of the Person of Francis Landy, Deceased; and Roger Crews, M.D., Appellants,
v.
The Honorable David H. BLUDWORTH, State Attorney, in and for the Fifteenth Judicial Circuit of the State of Florida, Appellee.
No. 82-552.
District Court of Appeal of Florida, Fourth District.
May 25, 1983.
*613 John R. Day of Shutts & Bowen, West Palm Beach, and Harvey J. Garod of Shutts & Bowen, Lake Worth, for appellants.
David H. Bludworth, State Atty., and Lisa J. Campbell, Asst. State Atty., West Palm Beach, for appellee.
HERSEY, Judge.
The issue raised by this appeal is one of life or death, or, more precisely, life without consciousness as opposed to death with dignity: Under what circumstances may artificial life sustaining procedures be terminated in the case of a comatose, terminally ill patient.
On April 10, 1981, Francis B. Landy was taken to John F. Kennedy Memorial Hospital. *614 He was terminally ill and within a few days lapsed into a coma. As artificial means were then required to keep him "alive," he was placed on life sustaining apparatus. Subsequently, his wife applied to the circuit court for appointment as guardian of his person. After her appointment by the court she requested the hospital and the treating physicians to remove all artificial means of life support in accordance with her husband's written wishes. She relied on a document, sometimes referred to as a "living" will or a "mercy" will, that her husband had executed in 1975.
Hospital personnel, uncertain as to whether they could rely on the "living" will without incurring civil and criminal liability, filed an action for declaratory relief in the circuit court. That petition was accorded expedited treatment by the court, but before a hearing could be held the patient died. Thereupon the widow and the treating physician, formerly respondents, joined in the petition for declaratory relief, leaving the State Attorney as the sole remaining respondent.
The petitioner urged in the trial court and argued here that the matter has not been rendered moot by the intervening death of the patient because of the frequency with which hospital personnel and physicians are requested to act under similar circumstances. Counsel cited as an example that, at the time of oral argument, there were forty comatose and terminal patients in John F. Kennedy Memorial Hospital. It is suggested that a justiciable issue is therefore presented. The trial court correctly acquiesced in that suggestion.
Since the controversy here is one likely to recur and may in the future again evade review, the issues presented are plainly not moot (see United States v. New York Tel. Co., 434 U.S. 159, 165, n. 6, 98 S.Ct. 364, 368, n. 6, 54 L.Ed.2d 376, quoting Southern Pacific Terminal Co. v. ICC, 219 U.S. 498, 515, 31 S.Ct. 279, 283, 55 L.Ed. 310; see, also, Roe v. Wade, 410 U.S. 113, 125, 93 S.Ct. 705, 712, 35 L.Ed.2d 147; East Meadow Community Concerts Assn. v. Board of Educ., 18 N.Y.2d 129, 135, 272 N.Y.S.2d 341, 346, 219 N.E.2d 172, 175).
Eichner v. Dillon, 73 A.D.2d 431, 426 N.Y.S.2d 517, 523 (N.Y. App. Div. 1980). See Times Publishing Co. v. Burke, 375 So.2d 297 (Fla. 2d DCA 1979).
This is a case of first impression in Florida and is the logical result of the supreme court's affirmance of this court's decision in Satz v. Perlmutter, 362 So.2d 160 (Fla. 4th DCA 1978), aff'd, 379 So.2d 359 (Fla. 1980). In Perlmutter, the court upheld the right of a competent adult who is suffering from a terminal illness to refuse or discontinue extraordinary medical treatment based on the constitutional right of privacy. This case seeks to determine the parameters under which that right is available to, and can be exercised by, incompetent adults (i.e., those in comas).
Since, man, through his ingenuity, has created a new state of human existence  minimal human life sustained by manmade life supports  it must now devise and fashion rules and parameters for that existence. That is the business this court is faced with. It is not an easy question to answer. It deals with many of our most basic legal, medical and moral concepts. However, it is a question that must be answered.
... .
While considerable law exists on the question of treatment, only five states have addressed the question as posed to this court, that is, treatment of the terminally ill, incompetent individual. In re Quinlan (1975), 137 N.J. Super. 227, 348 A.2d 801, modified and remanded (1976), 70 N.J. 10, 355 A.2d 647, certiorari denied sub nom. Garger v. New Jersey, 429 U.S. 922, 97 S.Ct. 319, 50 L.Ed.2d 289; Supt. of Belchertown State School v. Saikewicz (1977), 373 Mass. 728, 370 N.E.2d 417; Matter of Spring (Mass. 1980), [380 Mass. 629] 405 N.E.2d 115; Satz v. Perlmutter (Fla.App. 1978), 362 So.2d 160; Matter of Eichner (1980), 73 A.D.2d 431, 426 N.Y.S.2d 517; Severns v. Wilmington Med. Ctr. (Del.Sup.Ct., 1980), 421 A.2d 1334.
*615 Leach v. Akron General Medical Center, 68 Ohio Misc. 1, 426 N.E.2d 809, 812-813 (Ohio Com.Pl. 1980).
Every court that has considered a similar situation has concluded that a terminally ill comatose patient, like his fully conscious and competent counterpart, has a right to refuse medical treatment. Similarly, all agree that there must exist a corresponding capability
to exercise that right; were this not so the right would be an empty one, reduced to a meaningless "form of words", illusory and devoid of substance (see Mapp v. Ohio, 367 U.S. 643, 655, 81 S.Ct. 1684, 1691, 6 L.Ed.2d 1081; cf. Entwistle v. Entwistle, 61 A.D.2d 380, 384, 402 N.Y.S.2d 213, app. dsmd. 44 N.Y.2d 851). This right, the Quinlan court noted, "should not be discarded solely on the basis that [the incompetent's] condition prevents [a] conscious exercise of the choice." (Matter of Quinlan, 355 A.2d at 664, supra).
Eichner, 426 N.Y.S.2d at 544-545. However, the courts have not acted uniformly in determining the manner by which the right may be exercised. Some suggested procedures include recognition of a living will, e.g., Note, In re Living Will, 5 Nova L.J. 445 (1981), the proxy judgment and instructions of a guardian, e.g., In re Quinlan, 70 N.J. 10, 355 A.2d 647, the consensus of close relatives, but see In re Spring, 380 Mass. 629, 405 N.E.2d 115 (Mass. 1980), the certification of attending physicians that the comatose party is terminally and irreversibly ill and that the prospects of regaining cognitive brain function are extremely remote, see Commonwealth v. Golston, 373 Mass. 249, 366 N.E.2d 744 (Mass. 1977), cert. denied, 434 U.S. 1039, 98 S.Ct. 777, 54 L.Ed.2d 788 (1978), confirmation by a hospital ethics committee of the terminal and irreversible prognosis prior to termination, e.g., Eichner, 73 A.D.2d 431, 426 N.Y.S.2d 517, a judicial hearing, e.g., Leach, 68 Ohio Misc. 1, 426 N.E.2d 809, or some combination of these procedures.
In Quinlan, the court stated
Our affirmation of Karen's independent right of choice, however, would ordinarily be based upon her competency to assert it. The sad truth, however, is that she is grossly incompetent and we cannot discern her supposed choice based on the testimony of her previous conversations with friends, where such testimony is without sufficient probative weight. 137 N.J. Super. at 260, 348 A.2d 801. Nevertheless we have concluded that Karen's right of privacy may be asserted on her behalf by her guardian under the peculiar circumstances here present.
If a putative decision by Karen to permit this non-cognitive, vegetative existence to terminate by natural forces is regarded as a valuable incident of her right of privacy, as we believe it to be, then it should not be discarded solely on the basis that her condition prevents her conscious exercise of the choice. The only practical way to prevent destruction of the right is to permit the guardian and family of Karen to render their best judgment, subject to the qualifications hereinafter stated, as to whether she would exercise it in these circumstances. If their conclusion is in the affirmative this decision should be accepted by a society the overwhelming majority of whose members would, we think, in similar circumstances, exercise such a choice in the same way for themselves or for those closest to them. It is for this reason that we determine that Karen's right of privacy may be asserted in her behalf, in this respect, by her guardian and family under the particular circumstances presented by this record.
355 A.2d at 664.
Thus, the New Jersey Supreme Court held that
Upon the concurrence of the guardian and family of Karen, should the responsible attending physicians conclude that there is no reasonable possibility of Karen's ever emerging from her present comatose condition to a cognitive, sapient state and that the life-support apparatus now being administered to Karen should be discontinued, they shall consult with the hospital "Ethics Committee" or like *616 body of the institution in which Karen is then hospitalized. If that consultative body agrees that there is no reasonable possibility of Karen's ever emerging from her present comatose condition to a cognitive, sapient state, the present life-support system may be withdrawn and said action shall be without any civil or criminal liability therefor on the part of any participant, whether guardian, physician, hospital or others.
Quinlan, 355 A.2d at 671. Under this procedure, no court hearing is required prior to termination of the life support systems.
In Leach, the guardian of an individual who was terminally ill and in a permanent vegetative state applied for a court order for the removal of a respirator. The probate court granted the motion upon the following findings:
(1) The Constitution of the United States, as part of the right to privacy, guarantees to an incurably, terminally ill person, who is in a permanent, vegetative state, the right to decide future medical treatment.
(2) The facts of the case at bar do not demonstrate any compelling state interest paramount to or that outweighs the above right.
(3) The standard of proof required in cases of this nature is clear and convincing.
(4) Edna Marie Leach, being an incurably, terminally ill person, and in a permanent vegetative state, has the right of deciding medical treatment.
(5) As indicated in the Findings of Fact of this court, supra, Edna Marie Leach, if competent, would elect not to be placed on life supports.
(6) It is, therefore, the further finding of this court that the motion of her guardian, Gifford Leach, to terminate the respirator she presently is on, is well taken and should be granted.
426 N.E.2d at 816.
The Massachusetts Supreme Judicial Court has indicated that once a court order is sought, the ultimate decision-making responsibility to terminate life support apparatus rests with the probate court. Spring, 405 N.E.2d at 115. In that case the court specifically considered

The need for a court order. Neither the present case nor the Saikewicz case involved the legality of action taken without judicial authority, and our opinions should not be taken to establish any requirement of prior judicial approval that would not otherwise exist. The cases and other materials we have cited suggest a variety of circumstances to be taken into account in deciding whether there should be an application for a prior court order with respect to medical treatment of an incompetent patient. Among them are at least the following: the extent of impairment of the patient's mental faculties, whether the patient is in the custody of a State institution, the prognosis without the proposed treatment, the prognosis with the proposed treatment, the complexity, risk and novelty of the proposed treatment, its possible side effects, the patient's level of understanding and probable reaction, the urgency of decision, the consent of the patient, spouse, or guardian, the good faith of those who participate in the decision, the clarity of professional opinion as to what is good medical practice, the interests of third persons, and the administrative requirements of any institution involved. We are not called upon to decide what combination of circumstances makes prior court approval necessary or desirable, even on the facts of the case before us. Moreover, since the scientific underpinnings of medical practice and opinion are in a constant state of development, our opinion as to a particular set of facts may not be a reliable guide to the proper solution of a future medical problem. Nevertheless, we think it proper to review briefly the current legal situation.
Spring, 405 N.E.2d at 120-21. Nevertheless, the court concluded that action taken without judicial approval might be the subject of criminal or civil liability. Spring, 405 N.E.2d at 121.
*617 The New York Supreme Court established a procedure for exercising a comatose patient's right to terminate extra-ordinary life support measures in Eichner, as follows:
The physicians attending the patient must first certify that he is terminally ill and in an irreversible, permanent or chronic vegetative coma, and that the prospects of his regaining cognitive brain function are extremely remote.
426 N.Y.S.2d at 550.
Having reviewed the manner in which other jurisdictions have resolved this problem, it is now appropriate to analyze the lower court's final judgment. The court rejected a Quinlan like result because of the complex and diverse issues peculiar to each case. The procedure established in the judgment requiring an expedited judicial hearing prior to termination of mechanical medical systems accords with the decisions of the Ohio court in Leach and the New York Court in Eichner while setting a stricter procedure than mandated by the New Jersey court in Quinlan and the Massachusetts court in Spring.
Quinlan's principal objection to routinely requiring prior court approval for a decision to withhold treatment is that it would be impossibly cumbersome. Without an expedited procedure, the litigation process may become considerably protracted until the issue becomes moot by virtue of the death of the comatose patient. See Spring, Eichner, and the instant case. This will not ordinarily result under the procedure proposed in Landy (the case at bar) by the trial judge, as it calls for expedited review. Moreover, the court found there was little or no competition among patients for access to the life support machines. In pertinent part, the final judgment provides:
[T]he court determines and rules that in order to have obtained the relief sought in this case it was the right and duty of any interested person to cause a traditional statutory petition for the appointment of a guardian of person to have been filed. Once appointed that guardian has the right to file a petition for authority to order termination of extraordinary mechanical life support systems, seeking that authority to act in stead of his ward and to do what could have been done by the patient himself under Perlmutter. The attending physician and the hospital and its administrators abiding by the order of court on such petition shall not be liable criminally or civilly for such action.
The main purpose of appellants' appeal is to suggest that court approval should not be a prerequisite to compliance with the living will of a comatose, terminally ill individual and that other safeguards will serve as well. The sum and substance of appellants' analysis is set out in the initial brief:
The facts of the instant case are similar to that of Perlmutter. The only difference was that Mr. Perlmutter's instructions were given orally while Mr. Landy's judgment and instructions were communicated in writing by an unrevoked written directive. This distinction was not material. What was critical was that both patients were able to communicate their desires to the health care providers regarding the treatment to be received during their terminal condition.
We do not agree that the distinction between the Perlmutter circumstance and the Landy circumstance "was not material."
In Perlmutter the terminally ill patient was conscious and mentally competent although in excruciating pain. He was seventy-three years of age. Both Perlmutter and his family sought to terminate the life support systems. The issue was whether an individual's constitutional right to privacy, a concomitant element of which is said to be the right to die with dignity, must be subordinated to an overriding state interest in life. As we have previously noted, this court and the Florida Supreme Court determined that, under the circumstances of that case, the individual's constitutional rights were paramount.
In the context of a request to be permitted to die with dignity, the state's interests, as expressed in Perlmutter and the other cases, are: (1) the interest in the preservation of life, (2) the need to protect innocent third parties, (3) the duty to prevent suicide, *618 and (4) the requirement that it help maintain the ethical integrity of medical practice. In each of those categories we discern no reason to distinguish between the Perlmutter circumstance and the Landy circumstance. There are other aspects of the situation, however, that do require that the cases be treated differently.
There are significant distinctions between Perlmutter and Landy. In Perlmutter there was a present expressed intent by a mentally competent individual to be allowed to die with dignity. The individual himself was the direct beneficiary of the request and the benefit was cessation of pain and suffering. The financial savings to his estate and cessation of the emotional trauma inflicted upon his family by the necessity of watching a loved one suffer, while of immense importance to those involved, were distinctly ancillary benefits.
In Landy the request is presented in the form of a living will executed some years before the event, sought to be presently enforced by a family member-guardian-interested person on behalf of the comatose individual. If we may assume that in the case of a comatose individual there is no pain and suffering (philosophical considerations aside), then it would seem to follow that the direct beneficiary of the request is the family of the patient and that the benefits are financial savings and cessation of the emotional drain occasioned by awaiting the medico-legal death of a loved one.
This distinction between Perlmutter and Landy, among others, requires a change in focus from safeguarding the interests of the state to protecting the interests of the now terminally ill but comatose individual. One need not go so far back in history as Cain and Abel to recognize that the interests of various family members are not always synonymous nor even harmonious. The newspaper is a daily reminder that murderers are often related to their victims. While this consideration is moot in Landy because the patient is already deceased, and while it may constitute only a remote danger in future cases, it is a factor which must be taken into account.
With the foregoing considerations in mind, we first repeat what was said in Perlmutter:
[I]t is asserted that the question of "death with dignity" is a matter so complex that it should be left to the legislature, and the judiciary should abdicate to that process. We are told that the many variations of the problem and multiple issues subsumed under the general issue make it inadvisable at best for the Court to address the issue. On the other hand, counsel for the decedent and for the physician maintain that it is an issue which cries out for judicial resolution in a comprehensive manner so that physicians, public officials, hospitals and other citizens of the state may be guided in their future conduct.
As always seems to be the case, there is some merit in each assertion, but for that very reason we can fully embrace neither. Because the issue with all its ramifications is fraught with complexity and encompasses the interests of the law, both civil and criminal, medical ethics and social morality, it is not one which is wellsuited for resolution in an adversary judicial proceeding. It is the type issue which is more suitably addressed in the legislative forum, where fact finding can be less confined and the viewpoints of all interested institutions and disciplines can be presented and synthesized. In this manner only can the subject be dealt with comprehensively and the interests of all institutions and individuals be properly accommodated.
Nevertheless, preference for legislative treatment cannot shackle the courts when legally protected interests are at stake. As people seek to vindicate their constitutional rights, the courts have no alternative but to respond. Legislative inaction cannot serve to close the doors of the courtrooms of this state to its citizens who assert cognizable constitutional rights.
Perlmutter, 379 So.2d at 360.
If there was any doubt, at the time of Perlmutter, that Florida citizens enjoyed an *619 explicit right of privacy it has been put to rest by the adoption of Article I, Section 3, Florida Constitution (1980), entitled "Right of Privacy."
We are duty bound to implement that constitutional right and the concomitant right to die with dignity, under circumstances that render it either impossible or unwise to rely on Florida's "Recognition of brain death under certain circumstances" statute, Section 382.085, Florida Statutes (1981), and thus we affirm the final judgment.
Our holding necessarily rejects appellants' position that court approval should not be necessary. In our judgment an application by the court appointed guardian of a comatose and terminally ill individual requires review by a court of competent jurisdiction before life sustaining procedures may be suspended. Judicial proceedings are required under Chapter 744, Florida Statutes (1981), before an individual's property may be disposed of by a guardian or others. Since life itself is of infinitely greater value to an individual than his property, it seems only reasonable that at least equal safeguards be employed before life and death decisions are placed in the hands of others.
One of the primary tasks confronting a court upon an application for termination is to apply the so-called "substituted judgment rule" to determine from the known facts and circumstances what the individual would want done if he were conscious and competent. See In re: Guardianship of Bohac, 380 So.2d 550 (Fla. 2d DCA 1980). Other jurisdictions confronted with this issue have used a variety of methods to determine intent. The issue appears to be one of first impression, in this factual setting, in Florida. See, e.g., Quinlan, 70 N.J. 10, 355 A.2d 647; Severns v. Wilmington Medical Center, Inc., 421 A.2d 1334 (Del. 1980); Spring, 405 N.E.2d 115; Leach, 68 Ohio Misc. 1, 426 N.E.2d 809.
Our holding is limited to the case of a comatose patient in a hospital, whose condition has been certified by two physicians as being terminal, whose interests are protected by a court appointed guardian and where the patient at some earlier point has executed a living will or expressed or evidenced a like intention. Terminal condition means an incurable physical state caused by injury, disease, or illness which, regardless of the application of "life sustaining procedures," would produce death within a reasonable degree of medical probability, and where the application of life sustaining procedures serves only or primarily to postpone the moment of the patient's medico-legal death.
Certification means that a hospital patient has been diagnosed and certified in writing to be in terminal condition and where the prospects of regaining cognitive brain function are extremely remote. The diagnosis must be made and signed by the patient's attending physician and a consulting physician chosen by the patient before becoming comatose, both of whom have examined the patient. If the patient did not choose a consulting physician, the attending physician shall do so.
Life sustaining procedures are medical procedures which utilize mechanical or other artificial means to sustain, restore, or supplant a vital function, which serve only or primarily to prolong the moment of death, and where, in the judgment of the attending and consulting physicians, as reflected in the patient's medical records, death is imminent if such procedures are not utilized.
A spouse or another family member or, in the absence of either, any interested person or entity may apply for the appointment of a guardian of the person. Reasonable notice of the application for appointment shall be given to the spouse, to the parents, to brothers and sisters of the patient, to any adult children of the patient not joining in the petition and to the state's attorney. Such notice is also required upon the application to terminate life sustaining procedures. The state's attorney shall be a necessary party.
*620 Any "living" or "mercy" will alleged to have been executed by the patient shall, when duly proved by the testimony or recent affidavit of at least one of two disinterested witnesses as to the due execution of the document and the mental capacity of the patient at the time of execution, be received in evidence on the issue of the patient's present intent. Such a document should ordinarily constitute the best evidence of the intention of the patient. It shall be given such weight, however, as the trial court deems appropriate having considered the timeliness of its execution, the circumstances under which it was executed, its contents and any evidence of a contrary intention. Inasmuch as a living will was relied upon, at least to some extent, by the learned trial judge in this case we are constrained to label any implication to be drawn from this opinion that other forms of evidence might be acceptable as indicative of the patient's intent obiter dictum. We also stress that we do not treat, even inferentially, the case where no evidence of intention exists or where evidence of a contrary intention exists. Such cases will in our judgment involve different considerations than those which underlie the present opinion.
In summary, we hold that a duly appointed guardian of a comatose patient in terminal condition, and where that patient has previously evidenced an intention not to have life sustaining procedures utilized may, acting on the patient's behalf, apply to a court of competent jurisdiction (the probate division of the circuit court) for authority to instruct any health care provider and attending physician to remove, or not to furnish, "life sustaining procedures." Any such application shall, upon appropriate request, receive expedited treatment. The standard of proof in any such proceeding shall be clear and convincing evidence. The guardian of the person of the patient, the hospital administrator, the chief of the medical staff of the hospital and attending physicians, abiding by a court order obtained in this manner shall, after determining that the patient is suffering from a terminal condition, and after proper documentation in the patient's records, remove the patient from, or not connect the patient to, life sustaining procedures. Any person acting in good faith shall not be liable civilly or criminally for action taken in reliance on such an order.
We therefore affirm the final judgment in all respects. We certify the following question to the Supreme Court of Florida as one of great public interest:
In the case of a comatose and terminally ill individual who has executed a so-called "living" or "mercy" will, it is necessary that a court appointed guardian of his person obtain the approval of a court of competent jurisdiction before terminating extraordinary life support systems in order for consenting family members, the attending physicians, and the hospital and its administrators to be relieved of civil and criminal liability.
AFFIRMED and QUESTION CERTIFIED.
LETTS, C.J., and WALDEN, J., concur.